Ralph M. WYNN, M.D., et al., Plaintiffs,

v.

William J. SCOTT et al., Defendants.

John S. LONG, M.D., et al., Plaintiffs,

v.

William J. SCOTT et al., Defendants.

Nos. 75 C 3975 and 75 C 3981.

United States District Court,
N. D. Illinois, E. D.

April 12, 1978.

Merle L. Royce, II, Sidley & Austin, David A. Goldberger, Lois Lipton Kraft, Roger Baldwin Foundation of the American Civil Liberties Union, Inc., R. Peter Carey, Mandel, Lipton & Stevenson Limited, Chicago, Ill., for plaintiffs in No. 75 C 3975.

William J. Scott, Atty. Gen. of the State of Illinois, Fred F. Herzog, Dean of the John Marshall Law School, Herbert Lee Caplan, Asst. Atty. Gen., Chicago, Ill., for defendants Scott and Lashof.

Bernard Carey, State's Atty., Lorence H. Slutzky, Thomas D. Rafter, Asst. State's Attys., Chicago, Ill., for defendant Carey.

Nina G. Stillman, Rosemarie J. Guadnolo, Chicago, Ill., for amicus curiae.

Ralph E. Brown, Leon E. Lindenbaum, Maureen T. Healey, Whitman H. Brisky, Walsh, Case & Coale, Chicago, Ill., for plaintiffs in No. 75 C 3981.

Dennis J. Horan, Jerome A. Frazel, Jr., Chicago, Ill., for intervenor.

Before TONE, Circuit Judge and MARSHALL and KIRKLAND, District Judges.

MARSHALL, District Judge.

These consolidated cases challenge the constitutionality of the Illinois Abortion Act of 1975 (the Act). Plaintiffs seek a declaratory judgment holding the Act unconstitutional pursuant to 28 U.S.C. §§ 2201 and 2202, and an injunction restraining the enforcement of the Act pursuant to 28 U.S.C. §§ 2281 (repealed by Pub.L. 94–381, 90 Stat. 1119, but applicable to any action commenced on or before August 12, 1976) and 2284. The action is brought under 42 U.S.C. § 1983 and jurisdiction is present under 28 U.S.C. § 1343.

The Act was enacted on November 20, 1975. A temporary restraining order barring enforcement of it was issued on November 22, 1975. A three judge court was convened and on December 2, 1975, plaintiffs' motion for a preliminary injunction against the enforcement was granted. On December 19, 1975, these actions were certified as class actions under Rule 23(b)(1) and (b)(2).[1]

Thereafter plaintiffs moved for summary judgment. After that motion was fully briefed, the Supreme Court decided *Planned Parenthood Association of Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), an abortion case with several issues similar to the issues presented in these cases. Supplemental briefs analyzing the impact of *Danforth* were filed.

Three motions other than plaintiffs' motion for summary judgment are also pending. First, defendants have filed two motions to modify the preliminary injunction. The arguments presented in the first motion amount to an update of their memoranda in opposition to plaintiffs' motion for summary judgment. All parties agreed that the first motion to modify does not require additional briefing, and the arguments therein have been taken into account in our consideration of plaintiffs' motion for summary judgment. A second motion to modify the preliminary injunction has been fully briefed. In addition, plaintiffs have filed a motion to strike defendants' affidavits filed in support of their motions. We have determined that the contested portions of defendants' affidavits contain no facts

---

1. The order certifying classes did not define the classes. They consist of pregnant women and physicians similarly situated to the named plaintiffs. Additionally, a class of defendant State's Attorneys in Illinois was certified. Defendant Dr. Diamond's claim that a conflict of interest exists between women and physicians is insubstantial. Plaintiffs are able to provide and have provided adequate representation to both groups as required by Rule 23(a)(4).

which are material to the issues presented and we have not considered them in ruling on plaintiffs' motion.

It must be noted that defendants contend that there are genuine issues of material fact which must be tried. On that basis, they oppose the entry of summary judgment. We have concluded that there are no genuine issues of material fact. We have also concluded that portions but not all of the Act are unconstitutional. Accordingly, plaintiffs' motion for summary judgment is granted in part and denied in part and a summary judgment for defendants is granted with respect to those portions of the Act which are held constitutional. *See* 6 Moore's Federal Practice ¶ 56.12 (2d ed. 1976). The Act is reprinted as an appendix to this memorandum. The unconstitutional and hence unenforceable portions are italicized. They are § 2(6), the definition of criminal abortion; §§ 3(2)(a) and 3(2)(b), portions of the informed consent requirement; § 3(3), spousal consent; § 3(4), parental consent; § 5(2), second clause, two-doctor concurrence; §§ 7 and 8, termination of parental rights; § 9, ban on saline abortions; § 10, insofar as it incorporates the Vital Records Act; and § 11(a), criminal abortion.

The parties in these actions consist of the following persons. In *Wynn v. Scott,* the representative plaintiffs are four male physicians and two women, who were pregnant at the time the actions were filed. Each physician offers and performs abortions upon women who request them. Dr. Jerzy Jozef (George) Biezenski and Dr. Allan G. Charles have conducted research concerning pregnancy, and Dr. Charles has published articles on amniocentesis and other subjects. Plaintiff Dr. Yolanda Adler is a woman who was in the second trimester of pregnancy at the time the complaint was filed. She wished to undergo a surgical procedure to determine whether her fetus was genetically defective. If it proved defective, it was her desire to obtain an abortion. Plaintiff Mary Zoe is a woman who was also in the second trimester of pregnancy when the action was filed. She wished to obtain an abortion without the consent of her husband, from whom she had been separated for over three years. In *Long v. Scott,* plaintiffs are two Illinois not-for-profit corporations which perform abortion services for women, and a physician who regularly performs abortions.

Defendants in both actions consist of state officials charged with implementing and enforcing the Act. They are the Attorney General of Illinois, the Director of the Illinois Department of Public Health, and the State's Attorney of Cook County, who is sued in his official capacity and as the representative of a class of all other State's Attorneys in Illinois. In addition, Dr. Eugene Diamond has sought and obtained leave to intervene as a party defendant. Dr. Diamond presents arguments on behalf of parents of minor pregnant girls, husbands, viable and nonviable unborn fetuses and aborted fetuses who survive the abortion.

Our scrutiny of the Act is based on the three leading substantive Supreme Court decisions on abortions, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Planned Parenthood Association of Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Before addressing the merits of the complex issues presented, it will be helpful to restate briefly the general principles established by the Court, and some implications of those principles.

*Wade* and *Bolton* established that the constitutionally protected right of privacy encompasses a woman's decision to terminate her pregnancy, but that her right is not absolute. The extent to which a state may regulate or even override the woman's right increases throughout the three stages of pregnancy. During the first trimester, the abortion decision must be left to the woman and the medical judgment of her attending physician. During the second trimester the state may impose regulations which are rationally related to the legitimate state interest in the woman's health. After fetus viability, the state interest in

fetal life becomes compelling and the state may prohibit abortions except when necessary to preserve the life or health of the woman. *Wade, supra,* 410 U.S., at 164, 93 S.Ct. 705.

Plaintiffs rely on a number of decisions holding that certain abortion regulations are unconstitutional because they apply to all trimesters of pregnancy and because they impose an extra layer of regulation on abortions. These decisions, in turn, rest on language to that effect in *Wade* and *Bolton. See, e. g., Poe v. Gerstein,* 517 F.2d 787 (5th Cir. 1975) *aff'd,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976); *Friendship Medical Center Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); *Word v. Poelker,* 495 F.2d 1349 (8th Cir. 1974); *Doe v. Zimmerman,* 405 F.Supp. 534 (M.D.Pa.1975); *Planned Parenthood Association v. Fitzpatrick,* 401 F.Supp. 554 (E.D.Pa.1975), *aff'd sub nom., Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976); *Hallmark Clinic v. North Carolina Department of Human Resources,* 380 F.Supp. 1153 (E.D.N.C.1974); *Doe v. Rampton,* 366 F.Supp. 189 (D.Utah 1973). In *Danforth,* however, the Court laid these arguments to rest, and observed that not all abortion regulations that apply to the first trimester are unconstitutional, and that regulations dealing with abortions are not unconstitutional merely because the state does not impose similar burdens on other medical procedures. Abortion, unlike other medical procedures, involves the termination of a potential human life. *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 2386, 53 L.Ed.2d 484 (1977).

In analyzing the specific provisions of the Act, our task is twofold. If the provision is identical or similar to a provision before the Supreme Court in one of its abortion cases, the holding of the Court is directly applicable and it is unnecessary and, indeed, inappropriate, for us to reanalyze the underlying constitutional principles. Examples of provisions in the Act which fall into this category include § 3(3), spousal consent, § 3(4), parental consent, § 2(2), the defini-

tion of viability, and § 9, the ban on saline abortions. On the other hand, if the provision, or the issue raised with respect to that provision, is not significantly similar to one passed on by the Court, it is necessary for us to analyze and apply the relevant constitutional principles to the provision. Here the controlling principle is that regulations which interfere with the woman's right to decide whether to terminate her pregnancy must be narrowly drawn to meet the legitimate state interest at stake. *Wade, supra,* 410 U.S. at 155, 93 S.Ct. 705. Examples of provisions in this category include § 5(a), the two-doctor concurrence requirement in post-viability abortions, §§ 7 and 8, the termination of parental rights, and § 10, the reporting requirements to the extent that they incorporate the Illinois Vital Records Act.

Pursuant to defendants' second motion to modify the preliminary injunction, the parties have filed a second set of supplemental briefs, analyzing the impact of the three abortion cases recently decided by the Supreme Court: *Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and *Poelker v. Doe,* 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977). In *Maher,* the Court drew a distinction, for the purpose of constitutional analysis, between two kinds of state regulation of abortions.

In the first kind of regulation, the state places an absolute or partial obstacle in the path of the woman seeking an abortion. This kind of regulation interferes with the woman's privacy right to make certain kinds of decisions free from unjustified governmental interference. The Court noted that its earlier abortion decisions involved regulations of this type. For example, in *Wade, supra,* the challenged abortion statute limited the availability of abortions by imposing criminal sanctions upon physicians who performed them. In *Danforth, supra,* the state statutory requirement of spousal consent impermissibly granted the husband the power to veto his wife's decision to have an abortion. And in *Bolton, supra,* portions of a burdensome framework

of state regulation were held unconstitutional because they were not closely related to a compelling state interest. An abortion regulation falls within this latter category if it imposes a "restriction on access to abortions that was not already there." *Maher*, 97 S.Ct. at 2383. Since this kind of regulation infringes on a constitutionally protected right courts should insure that the regulation is narrowly drawn to meet a compelling state interest.

In the other kind of regulation, the state does not interfere with the woman's fundamental privacy right protected under the Constitution, but rather adopts a rule affecting abortions which implements the state's value judgment favoring childbirth over abortion. Such regulations are evaluated under a relaxed standard of scrutiny, and the state is afforded broader power to encourage actions thought to be in the public interest. The regulations challenged in *Maher* were of this type. They provided that the state welfare program would pay for medical expenses incident to childbirth, but that nontherapeutic abortions would not be funded. The Court characterized the regulations as a policy choice favoring childbirth rather than a direct state interference with the woman's right to an abortion. The Court emphasized that the regulations did not interfere with the woman's right because they left her in the same position as she would be without them. In other words, with or without the regulations, the woman would be dependent on private sources to procure and finance an abortion. Consequently, the Court in *Maher* held that the "less demanding test of rationality" (97 S.Ct. at 2385) was applicable and that it was constitutionally permissible for a state to encourage childbirth by funding expenses incident to pregnancy but not to abortion.

The Illinois Act is a more direct interference than the regulations before the Court in *Maher*. Like the statutes in *Wade, Bolton,* and *Danforth,* it coerces compliance through criminal penalties. In addition, the provisions of the Act, unlike those of the regulations in *Maher,* do impose restrictions on abortions that did not already exist.

Therefore, the relaxed standard of scrutiny applied in *Maher* is not appropriate here.

The Court's decision in *Maher* was based upon its characterization of the particular abortion regulations as something other than a direct state interference with a protected activity. The Court's decision "signals no retreat from *Roe* or the cases applying it," 97 S.Ct. at 2383, with respect to statutes which, like the Illinois Act, directly interfere with a constitutionally protected activity.

Hopefully this brief overview will clarify our discussion of the individual provisions of the Illinois Act. The first part of this opinion discusses the preliminary issues of standing, abstention, and severability. Next, the constitutionality of the individual civil provisions is analyzed. Finally, the arguments respecting the criminal penalties of the Act are treated. We find it unnecessary to address at length every contention made by plaintiffs. The constitutionality of many provisions can be resolved on narrower grounds than those raised. Other contentions, such as many arguments against the constitutionality of the statute as a whole, rest on the cumulative effect of the individual sections. Since many of these individual sections are unconstitutional, the cumulative effect argument diminishes in force. Finally, it is unnecessary to decide the constitutionality of § 1, which has no substantive effect. *Cf. Doe v. Israel,* 482 F.2d 156, 159 (1st Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772 (1974).

## I. STANDING, ABSTENTION AND SEVERABILITY

### A. *Standing*

■ Defendants challenge plaintiffs' standing to attack certain sections of the Act. The standing test contains two elements. First, the plaintiff must allege that he or she has a concrete, adversary stake in the outcome of the litigation and will suffer "injury in fact" if the statute is enforced. Second, as a prudential matter, the plaintiff must generally assert his or her own legal

rights. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In abortion cases, however, physicians may assert the legal rights of their pregnant patients if the physicians themselves are threatened with actual injury, such as the risk of criminal penalties for noncompliance with abortion regulations. *Bolton, supra; Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

■ The plaintiffs are two adult married women in the second trimester of pregnancy, five physicians, and two corporations which render abortion services. The women are interested in obtaining abortions, and the physicians all regularly perform abortions. The women have standing to complain of the provisions which could affect their decision to have an abortion. These provisions include § 2(2), the definition of viability; § 3(2), informed consent; § 3(3), spousal consent; § 4, abortions after the first trimester; § 5(2), the two-doctor concurrence requirement in post-viability abortions; § 7, the termination of parental rights; § 8, notice of termination of parental rights; § 9, the ban on saline abortions; and § 10, the reporting requirements to the extent that they infringe on the woman's privacy rights. They may also challenge sections which endanger their other constitutional rights, such as the right to procedural due process of law threatened by § 7 (termination of parental rights) of the Act. The five physicians have standing to challenge those provisions which impose obligations on them directly and affect either their own legal interests or the rights of their pregnant patients. They may attack all the provisions which the women have standing to attack except for §§ 7 and 8, the termination of and the notice of termination of parental rights. These two sections impose no duty on the physician directly. *Danforth, supra,* 428 U.S., at 62 n. 2, 96 S.Ct. 2831.[2] Additionally, the physician plaintiffs have standing to challenge

most of the other provisions of the Act because they impose obligations on the attending physician. These provisions include § 2(6), the definition of criminal abortion; § 5(1), the certification of nonviability; § 6(1), the physicians' standard of care; § 6(2), the homicide clause; § 6(3), the ban on fetal research; §§ 11(a) and (c), the specific criminal penalties; and § 12, the ban on fetal research. These provisions either affect the rights of the women patients or the rights of the physicians themselves.

■ No plaintiff has standing to challenge § 13, which provides that "[n]o physician, hospital, ambulatory surgical center, nor employee thereof, shall be required against his or its conscience to perform, permit or participate in any abortion." No plaintiff has alleged that a physician or hospital has invoked or threatens to invoke this clause to prevent obtaining or performing an abortion. In support of their standing, plaintiffs rely on cases holding that a public hospital must be available for abortion services. *E. g., Doe v. Mundy,* 514 F.2d 1179, 1183 (7th Cir. 1975); *Nyberg v. City of Virginia,* 495 F.2d 1342, 1347 (8th Cir. 1974). These cases do not dilute the constitutionally based requirement that a case or controversy must exist before a federal court may exercise jurisdiction. Although some plaintiff-physicians are staff members of public hospitals, there are no allegations that the conscience clause has been invoked against them.

■ Section 11(b), which bans advertising of any act which would violate the Illinois Abortion Act, presents unique standing problems. It provides that

"Any person who advertises, prints, publishes, distributes, or circulates any communication through print, radio, or television media advocating, advising or suggesting any act which would be a violation of this Act is guilty of a Class B misdemeanor."

2. Plaintiffs argue that § 7 does impose a duty upon physicians to notify the juvenile court when a fetus survives an abortion. The comparable provision in the Missouri Abortion Act imposed a similar duty upon physicians, but

the Court in *Danforth* nevertheless held that the physicians had no standing. Since the pregnant plaintiffs do have standing to attack §§ 7 and 8, the physicians' standing is irrelevant.

Clearly, this provision has no impact on the woman's decision of whether or not to have an abortion. Despite plaintiffs' assertion to the contrary, § 11(b) does not affect live, oral communication between a physician and patient. By its terms, § 11(b) only covers communication through print, radio, or television media.

None of the plaintiffs have done or proposed to do any act which they fear could violate this section. Although several of the plaintiff-physicians have published articles, including articles about amniocentesis, no one alleged that his article would "advocate, advise, or suggest" any act which would violate the Illinois Abortion Act. The diagnostic technique of amniocentesis is not prohibited by the Act. Plaintiff Dr. Charles submitted an affidavit in which he stated that § 11(b) constitutes a prior restraint on free speech in that it prohibits the publication of medical opinions, even in respectable medical journals. Yet Dr. Charles' statement says nothing about what he, Dr. Charles, wishes to do but refrains from doing, for fear of criminal prosecution. Without a plaintiff who alleges a specific threat to his First Amendment freedoms, we are powerless to decide whether § 11(b) violates the Constitution.

It has frequently been said that the usual strict rules concerning standing are relaxed when a First Amendment attack on a statute for vagueness or overbreadth is made. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 59–60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 815, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Gooding v. Wilson,* 405 U.S. 518, 520–21, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). A plaintiff may challenge an overly broad statute regulating speech without first showing that his own conduct could not be regulated by a narrowly drawn statute. This departure from strict standing rules reflects the extraordinarily high value placed on First Amend-

ment rights. Courts have recognized that the very existence of a statute burdening freedom of communication may cause persons not before the court to refrain from constitutionally protected speech.

Yet the threshold standing requirement remains unaffected. The plaintiff must claim "injury in fact" or show "specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972); *Bigelow v. Virginia,* 421 U.S. 809, 817, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Otherwise the issues are theoretical and the court is asked to deliver an advisory opinion, contrary to the constitutional limitation of the judicial power to actual cases and controversies. Of course, plaintiffs are not required to suffer criminal conviction in order to establish standing. *N.A.A.C.P. v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1962). They must, however, allege what it is that they would do but for the statute. Accordingly, we intimate no view on the constitutionality of § 11(b) unless and until at least one of the individual or corporate plaintiffs asserts standing to challenge it.

■ Additionally, no plaintiff has standing to question § 11(d), the ban on sale of abortifacients except upon the prescription of a physician. Each plaintiff is either a physician or under a physician's care, so no plaintiff is directly affected by § 11(d).

Finally, although two of the plaintiffs are organizations providing abortion services, they have not alleged or argued facts supporting their standing. We make no finding with respect to their rights or the rights of their members. *Cf. Local 194, Retail, Wholesale and Dept. Store Union v. Standard Brands, Inc.,* 540 F.2d 864 (7th Cir. 1976).

The wisdom of abiding by the threshold standing rules is particularly evident with respect to §§ 11(b), advertising; 11(d), sale of abortifacients; and 13, conscience. Of the hundreds of pages of briefs generated by plaintiffs' motion, only a handful have addressed the constitutionality of these pro-

visions. To the extent that the relevant issues are explored, they are treated abstractly. The issues are simply not sharpened as they would be if one of the plaintiffs alleged actual harm. Accordingly, for want of standing we deny plaintiffs the relief they seek regarding those sections of the Act.

## B. *Abstention*

█ Defendants suggest that it is appropriate for this court to abstain from deciding the constitutionality of all or part of the Act. Relying on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), defendant Carey isolates three of plaintiffs' arguments for which he urges abstention is "especially appropriate." These are that § 7, the termination of parental rights, violates the Fourteenth Amendment's due process clause because it incorporates irrebuttable presumptions,[3] that several provisions unconstitutionally impose criminal penalties for unintentional conduct, and that several provisions are unconstitutionally vague. For the following reasons, we hold that abstention is not appropriate in this case.

Although principles of equity, federalism, and comity are at the root of the equitable abstention doctrine, at least two specific policies have been distinguished in cases ordering federal courts to abstain from deciding constitutional issues they have jurisdiction to hear.[4] The first policy prevents federal courts from interfering with pending state criminal, quasi-criminal, and civil contempt proceedings. It is based on a proper respect for state functions, and the desire to avoid needless duplicative adjudication. *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger, supra.* If *Younger* abstention is appropriate the federal court should dismiss the federal plaintiff's claim. But if, as here, there are no pending state proceedings, the policy reasons underlying this type of abstention "have little force." *Steffel v. Thompson,* 415 U.S. 452, 463, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Accordingly, though plaintiffs claim that a state criminal statute imposes penalties for unintentional conduct, and claim that the criminal provisions are unconstitutionally vague, *Younger* abstention is not appropriate.

The second policy prevents federal courts from making a tentative and premature decision on the constitutionality of an ambiguous state statute, if a state court ruling on state law issues could avoid the need for deciding a federal constitutional issue or place that issue in a different light. *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Abstention is unnecessary if the state statute has been clarified through a state court interpretation, or if the language of the state statute is facially clear. *Kusper v. Pontikes,* 414 U.S. 51, 53–56, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Chicago v. Atchison, T. & S. F. R. Co.,* 357 U.S. 77, 84, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).

The difficulty arises when the parties disagree as to the meaning of some of the provisions or when the statute is allegedly void for vagueness. In the cases at bar, there is sharp disagreement as to the meaning of § 2(2), the definition of viability; § 2(6), the definition of criminal abortion; and § 6(1), the physicians' standard of care. Moreover, serious vagueness problems have been raised concerning these provisions. Because of these disputes, we are not immediately certain what these sections mean. Abstention would be an attractive alternative, because it would eliminate the necessi-

---

3. For reasons stated in part II *infra*, we hold that § 7 is unconstitutional without deciding the controversial irrebuttable presumption doctrine.

4. In a third line of cases, not relevant here, federal courts abstain to avoid needless conflict with a state in administering its own affairs or to avoid conflict with important state policies. *See generally Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813–817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

ty to resolve these questions. But the test for abstention is not whether the parties disagree, or whether the statute is unclear, but whether a state court decision would avoid or modify the difficult constitutional questions raised.

In making this determination, several factors emerge from the Supreme Court abstention decisions. First, the court should only consider plausible disagreements as to the meaning of the state statute in question. In *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), for example, the Court found the various interpretations suggested by the parties to be reasonable, and said that the "heated debate among the parties . . . is a strong indication of the ambiguities it contains." 428 U.S. at 148 n. 16, 96 S.Ct. at 2866. Yet the Court refused to abstain as to the physicians' standard of care section in *Danforth,* because it found the defendants' interpretation of the statute too "sophisticated" to be reasonable. This criterion enables us to eliminate some of the more imaginative interpretations of § 2(2) and § 6(1) as a basis for abstaining. For example, Dr. Diamond states that a fetus is viable if it is able to survive outside the womb for 28 days. Dr. Diamond's Brief at 142. We have no inkling of the basis for this definition. Equally unfounded is plaintiffs' assertion that since the physicians' standard of care does not specify how long the physicians must take measures to sustain fetal life, they "may be obliged to care for the fetus into senescence." Pltfs. Brief at 63.

A second factor in applying this test for abstention is whether there is a question of state law underlying the ambiguity. In *Bellotti,* for example, defendants articulated an interpretation of a parental consent provision grounded on a state law doctrine. Specifically, the Massachusetts abortion act provided that a minor girl could not obtain an abortion without parental consent. If her parents refused to consent, the girl could obtain an abortion upon a court order for good cause shown. The statute also provided that it did not abolish any common law rights of any other persons relative to the consent to the abortion. Defendants, representing the state, argued that the clause saving common law rights preserved the Massachusetts mature minor rule, which would permit a minor child capable of giving informed consent to obtain a court order without informing her parents. So interpreted, the Massachusetts act would not create a parental veto. In abstaining, therefore, the Supreme Court recognized that a state court interpretation of a state law doctrine could modify or avoid the federal constitutional question presented.[5] *See also Carey v. Sugar,* 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976) (federal court should abstain from deciding constitutionality of a state statute while state court interpretations of the statute were evolving); *Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975) (abstention ordered when decisions resolving unsettled relationship between state law and state constitution would alter federal constitutional issue); *Contra, Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) (abstention ordered although the only ambiguities in the unconstrued state statute could have been resolved without reference to state law issues). In this case, on the other hand, no one has suggested any Illinois law or doctrine which would avoid or modify the constitutional questions presented. Indeed, the issues as to §§ 2(2), 2(6), and 6(1), are whether these provisions are consistent with the direction taken in the Supreme Court abortion cases. Questions of federal law, not state law, are raised.

The final, and most subtle factor in applying *Pullman* abstention distinguishes between two types of vagueness attacks. If the statute is allegedly vague because the challenger cannot determine whether it applies to him or to a particular course of

---

5. The construction was rejected by the Supreme Judicial Court of Massachusetts in *Baird v. Bellotti,* Mass., 360 N.E.2d 288 (1977) with the result that enforcement of the statute was again enjoined by the district court. 428 F.Supp. 854 (D.Mass.1977).

conduct, and a single state court prosecution could resolve the uncertainty for him and for others similarly situated, then abstention would permit the state to rehabilitate the statute. But if the statute is so totally vague that a single adjudication would not eliminate the unclarity, then the statute should be stricken immediately. *Harris County Comm'rs v. Moore,* 420 U.S. 77, 86 n.9, 95 S.Ct. 870 (1975); *Procunier v. Martinez,* 416 U.S. 396, 401 n.5, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). A corollary of this distinction is that abstention is required if the statute is ambiguous in that it is capable of two or more meanings. If it is vague in that it simply has no precise meaning, then the federal court need not forbear.

Another way to express this distinction is that abstention is required only when a statute is allegedly void for vagueness and persons to whom the statute plainly applies cannot understand what is required of them and do not wish to give up all activity, especially constitutionally protected activity, arguably within the scope of the vague terms. *Baggett, supra,* at 378, 84 S.Ct. 1316; *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Landry v. Daley,* 280 F.Supp. 938, 947–48 (N.D.Ill. 1968). And even if the statute is ambiguous rather than vague, but is subject to constitutional attack on other grounds, such as overbreadth, abstention is not required. *Procunier v. Martinez, supra,* 416 U.S. at 402, 94 S.Ct. 1800; *Landry v. Daley, supra,* at 949 n.25.

We think that the vagueness attack is not one for which abstention is required. We cannot say that a single state court prosecution would eliminate the uncertainty in § 2(6), which is held void for vagueness in Part II–L., *infra.* If § 2(6) were left stand-

ing pending an authoritative state court decision, physicians might needlessly face criminal prosecution. And, for the reasons stated in Part II–A. and Part II–G., *infra,* we have concluded that § 2(2) and § 6(1) are not void for vagueness. In view of the application of all three factors, abstention would not be beneficial or serve the policies which the doctrine was designed to promote.

Additional policies support our conclusion that abstention is inappropriate here. Abstention is an equitable doctrine and courts should consider whether its consequences are equitable. *Pullman* abstention sets into motion inevitable delays while the federal court holds the case in abeyance. The uncertainty in the law is aggravated, and the procedure is slow and costly.[6] *Zwickler v. Koota,* 389 U.S. 241, 251, 88 S.Ct. 391 (1967).

Nor does the Seventh Circuit's recent opinion in *Yesterday's Children v. Kennedy,* 569 F.2d 431 (1977), require a different conclusion. There abstention was approved to enable the Illinois courts to determine the circumstances under which they will lift an apparent statutory prohibition on disclosure to adopted children of the identity of their natural parents and siblings. The vindication of the constitutional rights involved in *Yesterday's Children* is of greatly lesser urgency than the preservation of the constitutional rights involved here. Without in any way denigrating the interest or sincerity of purpose of the plaintiffs in *Yesterday's Children* what they seek is an historic fact concerning their lives. Here, on the other hand, the class of women plaintiffs seek to exercise a constitutional right which, with each passing day, becomes physically more difficult and dangerous, to the end that their constitutionally guaranteed decision to terminate their pregnancy may be totally frustrated if they are prevented from acting with dispatch.

---

**6.** The subsequent history of *Bellotti v. Baird* shows that *Pullman* abstention can increase rather than relax the tensions between federal and state courts. In *Bellotti,* the three judge court held the Massachusetts parental consent provisions in a 1974 Massachusetts abortion statute unconstitutional. 393 F.Supp. 847 (D.Mass.1975). After the Supreme Court re-

versed and ordered abstention, 428 U.S. 132 (1976), the Massachusetts Supreme Judicial Court issued a construction of the statute, *Baird v. Bellotti,* 360 N.E.2d 288 (1977), the three judge district court again enjoined its enforcement. *Baird v. Bellotti,* 428 F.Supp. 854 (D.Mass.1977).

Illinois lacks a procedure whereby a federal court may certify state law questions to the Illinois Supreme Court for relatively quick determination. *Compare Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2847, 49 L.Ed.2d 844 (1976); *Sidle v. Majors,* 536 F.2d 1156 (7th Cir. 1976). The absence of a state certification procedure is not dispositive, but it does point to the long delay which would follow abstention here and prolong the uncertainty that women and their physicians would have to endure.

### C. Severability

■ The final preliminary inquiry is whether the provisions of the Act are severable, or whether they stand or fall as a unit. *Guste v. Jackson,* 429 U.S. 399, 97 S.Ct. 657, 50 L.Ed.2d 638 (1977). State law is controlling on the issue of severability. *Danforth, supra,* 428 U.S., at 100, 96 S.Ct. 2831 (White, J., dissenting in part). The test under Illinois law focuses on the structure of the statute and the intent of the legislature:

[T]he settled and governing test of severability is whether the valid and invalid provisions of the Act are "so mutually connected with and dependent on each other as conditions, considerations, or compensations for each other, . . . [that] the legislature would not pass the residue independently . . . ." *Fiorito v. Jones,* 39 Ill.2d 531, 540, 236 N.E.2d 698, 704 (1968).

Defendants' position is that the provisions are severable and plaintiffs maintain that the Act is unconstitutional as a whole and must be entirely stricken.

It is true that many sections of the Act are interrelated. Section 4, for example, incorporates § 3, and § 8 refers to § 7. In addition, §§ 4, 5, 6, and 8 all rely on the definition of viability in § 2(2). Yet some provisions, such as the reporting requirements, § 10, the ban on experimentation, § 12, and the conscience clause, § 13, stand independent from the rest of the Act. The common denominator is that all provisions regulate abortions, but the sections are not so intertwined that structurally and logically, a constitutional defect in one provision taints the remainder.

The severability clause, § 14, shows that the will of the legislature is in favor of severability. Section 14 provides that

"[i]f any provision of this Act or the application thereof to any person or circumstance shall be held invalid, such invalidity shall not affect the provisions or application[s] of this Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable." [7]

Nevertheless, plaintiffs contend that the Act is unconstitutional as a whole because it is the product of an impermissible state purpose, to discourage and frustrate a woman's right to an abortion in every case. *Doe v. Rampton,* 366 F.Supp. 189 (D.Utah 1973); *Abele v. Markle,* 369 F.Supp. 807 (D.Conn. 1973); *Doe v. Turner,* 361 F.Supp. 1288, 1292 (S.D.Iowa 1973).[8] We disagree with plaintiffs' interpretation of the state purpose. Section 1 of the Abortion Act states that the intention of the General Assembly is to reasonably regulate abortions in conformity with Supreme Court decisions.[9]

---

**7.** Section 14 distinguishes between severability of each provision from the Act as a whole and severability of one application of a provision between other applications of the same provision. Since plaintiffs challenge the Act on its face, and not a specific application of the Act, the validity of severing specific applications is not directly before us. Nevertheless, with respect to those provisions upheld in this constitutional challenge, we recognize that the application of these provisions in specific instances may create additional constitutional questions. Implicitly, then it is necessary to uphold the severability of one application of a section from other applications of the same section. Otherwise, by upholding a provision as constitutional on its face, we would foreclose all future challenges to that provision as applied. *See Landry v. Daley,* 280 F.Supp. 938, 967 (N.D.Ill. 1968).

**8.** Other cases holding abortion statutes nonseverable include *Leigh v. Olson,* 385 F.Supp. 255 (D.N.D.1974) and *Coe v. Gerstein,* 376 F.Supp. 695 (S.D.Fla.1973).

**9.** Plaintiffs raise with some frequency the argument that provisions of the Abortion Act are

And if each provision of the Act in fact impermissibly obstructed a woman's right to an abortion in every case, then each provision would be held unconstitutional apart from the severability clause.

Finally, plaintiffs suggest that the Act must be stricken as a whole because it is impossible to predict what the legislature would do if part of the Act were held unconstitutional. To engage in such speculation, plaintiffs maintain, is to usurp the province of the legislature. The simple answer to this contention is that the severability clause expresses the intent of the legislature, and that is to uphold as much of the Act as possible. If the Illinois General Assembly is dissatisfied with the Act after this decision, nothing prevents it from amending the Act, or repealing what is left and starting anew. Indeed, legislation regulating abortions has been under consideration in the Illinois General Assembly while this action has been under advisement.

Consequently, the provisions of the Act shall be held severable consistent with the severability clause. *See Hodgson v. Lawson,* 542 F.2d 1350 (8th Cir. 1976); *Wolfe v. Schroering,* 541 F.2d 523 (6th Cir. 1976); *Planned Parenthood Ass'n v. Fitzpatrick,* 401 F.Supp. 554, 564 (E.D.Pa.1975); *Poe v. Menghini,* 339 F.Supp. 986 (D.Kan.1972).

## II. THE MERITS

### A. *The Definition of Viability*

Section 2(2) of the Act defines viability as "that stage of fetal development when the life of the unborn child may be maintained outside the womb by natural or artificial life-supportive systems." Since several other provisions of the Act incorporate the words "viable" or "viability," the constitutionality of this definition is critical. Plaintiffs contend that this definition is unconstitutionally vague and must be interpreted to mean the earliest age at which any fetus has ever survived, when read with the state policy that a fetus is a human being from the moment of conception. Plaintiffs also assert that the inconsistent definitions proposed by defendants prove that the definition is vague.

In *Danforth, supra,* the Court upheld a definition of viability very similar to the Illinois definition. The Missouri abortion statute in *Danforth* defined viability as "that stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-support systems." The Court held that this definition was flexible and reflected the fact that viability was "a matter of medical judgment, skill, and technical ability." Noting that this definition was consistent with the principles created in *Wade,* the Court specifically rejected the argument that unless the definition of viability is set at a specific gestational age, it is void for vagueness.

Defendant Carey asserts that the definition of viability in the Illinois Act is substantially similar to the definition upheld in *Danforth.* His interpretation of the statute is entitled to some weight because he represents officials charged with enforcement of the statute. *Bellotti v. Baird,* 428 U.S. 132, 143, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). Moreover, his interpretation is straightforward and reasonable. The Illinois definition of viability also preserves flexibility and leaves the viability decision in the hands of the attending physician. The only difference between the Missouri and Illinois definitions is that Illinois substitutes the word "maintained" for "continued indefinitely." Both terms may be defined as to preserve, to carry on, to remain in existence, or to keep up. *Webster's Third New International Dictionary* (1963). The fact that only the Missouri definition includes a word indicating duration—indefinitely— does not obscure our conclusion that these terms are synonymous.

In passing, we note that Dr. Diamond proposed three definitions for viability. All

___

unconstitutional because of the impermissible legislative policy that a fetus is a human being from the moment of conception. This contention, wherever raised, is incorrect. In Section

1, the legislature clearly recognized that under Supreme Court decisions, its prior policy is unconstitutional, and Section 1 is of no practical effect.

three distort the plain language of the statute and ignore the Supreme Court's analysis of viability in *Wade* and *Danforth*. Dr. Diamond suggests that viability means 20 weeks of gestation, born alive, or able to survive for 28 days. "20 weeks of gestation" would fix the point of viability and destroy the flexibility which is essential. "Born alive" would be overbroad because it would include a fetus with no possibility of survival which was born with minimal life signs. "Able to survive for 28 days" would be impossible to ascertain before an abortion, when the viability decision must be made, and would erroneously exclude viable infants who did not survive due to a post-birth incident. In any event, Dr. Diamond has abandoned these interpretations since *Danforth* was decided and now takes the same position as defendant Carey. To the extent that plaintiffs' vagueness argument rests on Dr. Diamond's erroneous interpretations, it, too, is without merit. A statute is not unconstitutional because someone does not understand it.

### B. *Informed Consent*

◼ The informed consent provision, § 3(2), has provoked a fervent debate. After considering the arguments, we conclude that clauses (a) and (b) unconstitutionally intrude upon a woman's right to decide whether or not to terminate her pregnancy. The remaining portions of the informed consent provision are similar to provisions upheld by the Supreme Court and withstand plaintiffs' arguments. Section 3(2), read with § 4, provides as follows.

> Section 3. No abortion shall be performed prior to the end of the first trimester of pregnancy except:
>
> \* \* \* \* \* \*
>
> (2) After the woman, prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion. The in-

formed consent shall state that the woman has been informed of the following:

> (a) The physical competency of the fetus at the time the abortion is to be performed, such as, but not limited to, what the fetus looks like, the fetus ability to move, swallow, and its physical characteristics;
>
> (b) The general dangers of abortion, including, but not limited to, the possibility of subsequent sterility, premature birth, live-born fetus and other dangers; and
>
> (c) The particular dangers of the procedure to be used.[10]

In *Danforth,* the Supreme Court upheld an informed consent provision which was identical to the first sentence of § 3(2) in the Illinois Act. The Court reasoned that requiring written informed consent does not in itself restrict the decision of the patient and her physician. The Court noted that the decision to abort is "important" and often "stressful" and said that "it is desirable and imperative that it be made with full knowledge of its nature and consequences." The Court indicated that limits could be placed on the state's ability to regulate informed consent. If the provision at issue in *Danforth* had meant more than what would be done in an abortion and the consequences of the procedure, it "might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession." *Danforth, supra,* 428 U.S., at 67 n. 8, 96 S.Ct. at 2840. In his concurrence, Justice Stewart notes that although a provision must not thwart a woman's decision, the state may try to ensure that the abortion decision is made in a knowing, intelligent, and voluntary fashion. *Id.* at 90, 96 S.Ct. 2831.

Since *Danforth,* the Court has summarily affirmed the decision of a three judge court upholding an informed consent provision more detailed than that in *Danforth.* This

---

**10.** The next sentence in § 3(2) creates a criminal offense for a physician's failure to secure an informed consent. The constitutionality of this section is discussed in Part II–L., *infra.* Finally, § 3(2) provides that any violation of

this section shall be admissible in a civil suit. Plaintiffs do not allege that this sentence is unconstitutional except insofar as it refers to § 3(3) and § 3(4), spousal and parental consent, which are unconstitutional.

provision stated that a woman must be advised that there may be unforeseeable and harmful physical and psychological effects, that alternatives to abortion include childbirth and adoption, and of the medical procedures to be used. *Planned Parenthood Ass'n. v. Fitzpatrick,* 401 F.Supp. 554 (E.D. Pa.1975), *aff'd sub nom., Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). *See also Wolfe v. Schroering,* 541 F.2d 523, 526 (6th Cir. 1976).

The holding in *Danforth* leaves no doubt that the first sentence of § 3(2) of the Illinois Abortion Act is constitutional. However, the guidelines discussed in *Danforth* raise serious doubts as to the validity of clauses (a) and (b). Plaintiffs argue with considerable force that those clauses thwart and restrict a woman's decision to have an abortion and they are not narrowly drawn to meet the state interest at stake, which is to insure that the woman is aware of her decision and of its significance. We need not decide this question, however, because clauses (a) and (b) are invalid for other reasons.

The clauses are both overly vague and overly specific. Both sections list specific facts which the woman must be told, yet preface the list with the words, "such as, but not limited to" (clause (a)) and "including but not limited to . . ." (clause (b)). The physician does not have fair warning of what is required. It is unclear whether the state could prosecute a physician for failure to warn the woman of a danger not included in the list. On the other hand, the very specificity of clauses (a) and (b) places the physicians in the "straight-jacket" condemned in *Danforth.* For example, a physician performing a first trimester abortion must tell the woman that there is a danger of a live-born fetus, when it is impossible that her abortion will result in a fetus born alive. And the physician must tell the woman that there is a danger of subsequent sterility despite the fact that studies have not shown that this danger actually exists. *See* National Academy of Sciences, *Legalized Abortion and Public Health,* 5–6 (1975) (appendix to Plaintiffs' Motion for Summary Judgment).

We conclude that §§ 3(2)(a) and (b) are unconstitutional. Section 3(2)(c), on the other hand, is constitutional because it merely provides that the woman be informed of the risks she will take in submitting to the specific abortion procedure.

### C. *Spousal and Parental Consent*

■ Sections 3(3) and 3(4) provide for spousal and parental consent respectively. They are substantially similar to provisions stricken by the Court in *Danforth.* Based on that decision, defendants have conceded that both are unconstitutional. We agree and hold that these provisions of the Act are unconstitutional.

### D. *Regulations on Second Trimester Abortions*

■ Plaintiffs next contend that § 4 is unconstitutional. This section provides that no abortion shall be performed after the first trimester unless the requirements of § 3 are met and

> "the abortion is performed in a hospital, on an inpatient basis, with measures for life support for the fetus which must be available and utilized, if there is any clearly visible evidence of viability."

First, plaintiffs assert that § 4 is unconstitutional because it incorporates the invalid provisions of § 3 and the invalid definition of viability in § 2(2). For the reasons stated in Part II–B. and C., *supra,* we have concluded that §§ 3(2)(a), 3(2)(b), 3(3), and 3(4) are unconstitutional. Section 4 must be interpreted as incorporating only the constitutional portions of § 3 and the constitutionally permissible definition of viability in § 2(2). If § 4 is so interpreted, plaintiffs' invalid incorporation argument is without merit.

Plaintiffs also argue that the requirement of hospitalization and the need to have certain equipment available are not rationally related to maternal health and impose an extra layer of regulation not applicable to any other medical procedure. They also claim that a physician would face criminal prosecution if he or she performed

an emergency abortion outside a hospital after the first trimester.

In *Wade, supra,* the Court held that after the first trimester, the state may regulate abortions in ways that are reasonably related to maternal health. The Court specifically stated that the state may require that abortions after the first trimester be performed in hospitals. *Id.* 410 U.S. at 163, 93 S.Ct. 705. Since this regulation is not unconstitutional, the incremental burden of having life saving equipment available for the fetus, should there be evidence of viability, is not overly burdensome. Finally, plaintiffs' apprehension that § 4 might inhibit emergency abortions is entirely speculative. None of the plaintiffs claim that they ever needed or performed emergency abortions. No plaintiff has even mentioned an instance where a second trimester abortion was required and there was no time to go to a hospital. The methods of performing abortions after the first trimester are relatively complicated. Injection of saline or prostaglandins into the amniotic sac, and hysterotomies take time and require controlled conditions. We conclude that § 4 is rationally related to maternal health and is therefore constitutional.

### E. Certification of Nonviability

■ Section 5(1) of the Act provides that no nontherapeutic abortion shall be performed "unless the attending physician first certifies with reasonable medical certainty that the fetus is not viable." Plaintiffs raise several objections to this section, but most of their arguments rest on the assumption that the definition of viability in § 2(2) is unconstitutionally vague. For the reasons stated in Part II–A., *supra,* we have upheld that definition of viability.

Furthermore, § 5(1) is consistent with the Supreme Court's mandate that the determination of viability is a matter of medical judgment. The criterion that § 5(1) creates is a medical one; the certificate of nonviability must be made with "reasonable medical certainty." Nor does the existence of criminal sanctions render § 5(1) unconstitutional. Physicians may be punished for

failure to make a certification, but not for an erroneous certification. *Danforth, supra,* 428 U.S., at 89, 96 S.Ct. 2831 (Stewart, J. concurring). The Act has other safeguards to insure that if the physician makes an erroneous certification of nonviability, the possibility of saving the life of the fetus is not ignored. Section 4 requires that abortions performed after the first trimester be done in a hospital, with measures for life support to be used if there is any clearly visible evidence of viability. The duty imposed in § 4 is not contingent on the physicians' pre-abortion conclusion as to viability.

In sum, the certification of nonviability, like the definition of viability, leaves the determination of the elusive point of viability to the sound judgment of the physician. Section 5(1) is not facially unconstitutional.

### F. Physician Consultation Requirement in Abortions of Viable Fetuses

Section 5(2) provides that

"when the fetus is viable no abortion shall be performed unless medically necessary to preserve the life or health of the mother and only after consultation with at least two other physicians not related to or engaged in practice with the attending physician."

There are two commands in this provision, and plaintiffs urge that each command is unconstitutional.

■ The first command is that nontherapeutic abortions are prohibited after viability. Plaintiffs assert that this requirement is void for vagueness. They specifically claim that the words "preserve" and "necessary" have many meanings and leave too much discretion in the hands of the state officials who will enforce the statute. Plaintiffs' line of attack is foreclosed by *Wade.* There, the Court said that a state may proscribe abortions after viability except when necessary to preserve the life or health of the mother. *Wade, supra,* 410 U.S., at 166, 93 S.Ct. 705. The Act does no more than incorporate the Court's language in *Wade.* Additionally, in *United States v. Vuitch,* 402 U.S. 62, 91 S.Ct. 1294, 28

L.Ed.2d 601 (1971), the Court held that in a comparably worded provision, the word "health" included mental health and thus was not unconstitutionally vague. And in *Bolton,* 410 U.S. at 191, 93 S.Ct. 755, the Court indicated that the word "preserve" in a similar provision was not void for vagueness. Plaintiffs rely on *Doe v. Scott,* 321 F.Supp. 1385 (N.D.Ill.1971), which held the words "necessary" and "preserve" unconstitutionally vague, but *Scott* was vacated in light of *Wade* and *Bolton,* 410 U S. 950, 93 S.Ct. 1410, 35 L.Ed.2d 682 (1973), and does not retain any precedential value. The first command of § 5(2), consequently, is not void for vagueness.

■ The requirement that two doctors consult with the attending physician in a post-viability abortion, however, raises more serious constitutional difficulties. Plaintiffs claim that this part of § 5(2) is unconstitutional because it interferes with the judgment of the attending physician and because it imposes a restriction not applicable to any other medical procedure.

In *Bolton,* the Court struck a statute which required two doctors to agree with the attending physician before any abortion could be performed. The Court said that the judgment of the attending physician should be sufficient, that the additional consents had no rational connection to the patient's needs, and that the requirement unduly infringed on the physician's right to practice his or her profession. 410 U.S. at 198–200, 93 S.Ct. 755.

One distinction between § 5(2) of the Illinois Act and the statute in *Bolton* is manifest: § 5(2) of the Illinois Abortion Act is limited to abortions after viability. At that time, the state may regulate abortions more heavily, and may proscribe nontherapeutic abortions to vindicate the compelling state interest in fetal life. Hence the state's burden of justifying the Illinois statute may be easier to meet than in *Bolton.*

Nevertheless, it is necessary to scrutinize § 5(2) to determine whether it is narrowly drawn to express only the legitimate state interests at stake. *Wade,* 410 U.S. at 155, 93 S.Ct. 705. The two legitimate state in-terests are the interest in preserving maternal health, which arises after the first trimester, and the interest in preserving fetal health, which arises after viability. There is no direct relationship between either interest and the number of physicians participating in the decision. Both interests are more directly expressed through other provisions of the Act, such as § 6(1), the physicians' standard of care, and § 3(2)(c), the informed consent provision.

It could be argued that the two-doctor consultation is calculated to delay post-viability abortions and prevent overly hasty decisions. If so, § 5(2) is not rationally related to this goal. The obvious method to delay abortions is a statutory waiting period. In *Wolfe v. Schroering,* 541 F.2d 523, 526 (6th Cir. 1976), for example, the abortion statute included a waiting period, with an exception for emergencies. Moreover, § 5(2) would not necessarily result in a delay sufficient to force a woman to re-examine her decision. Section 5(2) states that the physician must consult with other physicians, but need not secure their approval. Could this consultation consist of a five minute telephone conversation? Nothing in the statute requires more, and § 5(2) would then amount to no more than a rubber stamp. *Poe v. Menghini,* 339 F.Supp. 986, 995 (D.Kan.1972). Even if the statute required approval and not merely consultation, there would be nothing to preclude such *pro forma* consultations. The clause providing that the consulting physicians must be unrelated to the attending physician does not guarantee that they will be objective or that they will adequately speak for either the woman's or the fetus's interests. Finally, § 5(2) does not clarify whether the attending physician may perform an abortion after viability if the consulting physicians do not agree that the procedure is medically necessary to preserve the woman's life or health. Undoubtedly the attending physician would prefer to err on the side of safety and forego the abortion, even if his or her professional belief that the abortion was necessary were sincere and well founded.

Defendant Carey suggests that a woman might dupe her physician into believing that she needed a therapeutic abortion to preserve her mental health, when, in fact, she did not. He offers no suggestion as to how he or anyone else could detect such a pretense. Even if this diagnostic problem could be overcome, it is unclear how § 5(2) would prevent it. Under § 5(2), the two consulting physicians need not examine the woman independently. Presumably they may rely upon information supplied by the attending physician. Thus, they would not be in a better position to prevent women from fraudulently securing abortions after viability.

Finally, in his motion to modify the preliminary injunction, defendant Carey relies on the reasoning in *Doe v. Deschamps,* 64 F.R.D. 652 (D.C.Mont.1977). There, the court upheld an abortion provision stating that before a post-viability abortion may be performed, two doctors must agree with the attending physician that the abortion is necessary to preserve the woman's life or health. The court said that medical judgments in this area vary widely and requiring more than the approval of the woman and her physician helps to preserve fetal life. The court noted that the will of the woman and her physician are no longer of primary consideration.[11] · Yet the court called the question a "close one" and noted that plausible arguments could be made on either side.

Despite *Deschamps,* we adhere to our conclusion that § 5(2) of the Illinois Act is not narrowly drawn to meet the legitimate state interests at stake. The additional consultations have no rational connection to either the patient's or the fetus's needs. Though the will of the woman is no longer dispositive after viability, the medical standard established in the first clause of § 5(1), and the physicians' standard of care, is sufficient to assure the state's interest in preserving fetal life. If the attending physician fails to exercise acceptable clinical judgment, professional censure and deprivation of his license are available remedies. *Bolton,* 410 U.S. at 199, 93 S.Ct. 755. Defendants have failed to show the existence of a genuine issue of material fact, and the second clause of § 5(2), "and only after consultation with at least two other physicians not related to or engaged in practice with the attending physician" is declared unconstitutional.

### G. *Physicians' Standard of Care*

■ Section 6(1) of the Act provides that

> "No person who performs or induces an abortion after the fetus is viable shall fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted. Any physician or person assisting in the abortion who shall intentionally fail to take such measures to encourage or to sustain the life of viable fetus or child, and the death of the viable fetus or the child results, shall be deemed guilty of a Class 2 felony."

The duty of care arises only after viability. In this respect, § 6(1) of the Illinois Act differs from the physicians' standard of care provision before the Court in *Danforth.* The Court in *Danforth* struck the provision because it failed to exclude abortions before viability. According to defendants, the decision in *Danforth* disposes of plaintiffs' arguments respecting the constitutionality of § 6(1). Plaintiffs, however, raise an argument which was not considered by the Court in *Danforth.* They contend that § 6(1), though limited to abortions after the fetus is viable, improperly strikes the balance in favor of the fetus and against the woman. In essence, plaintiffs' position is that abortions after viability are permitted only when the woman's life or health is in

---

11. The only interest of more primary consideration is that of the fetus. Yet, as discussed above, the two consulting doctors are not bound by the statute to represent the interests of the fetus. Nothing in the provision suggests that the state has or could delegate that responsibility to them.

jeopardy. In that situation, the physicians' primary concern should be the health of the woman. Section 6(1) distracts the physician from caring for her needs. In fact, it requires the physician to sacrifice the woman for the unborn fetus, when the needs of the two conflict.[12]

We disagree with this interpretation of § 6(1). It does not require that the physician increase the risk to the woman in order to save the fetus. If, however, there are instances where a physician has a choice of procedures, both of equal risk to the woman, the physician must choose the procedure which is least likely to kill the fetus. This choice would not interfere with the woman's right to terminate her pregnancy. It never could be argued that she has a constitutionally protected right to kill the fetus. She does not.[13]

In *Doe v. Rampton,* 366 F.Supp. 189, 193 (D.Utah 1973), the court struck a provision similar to § 6(1) which did not exclude abortions before viability on the grounds that it might apply in any trimester. The dissenting judge thought that the standard of care toward the fetus would only arise after the fetus became viable. He would have upheld the provision. He thought that the section required the physician to use his best skills to save the life of the fetus in the context of saving the mother's life, which is the physician's first and primary duty. *Id.* at 204–05. The dissenting judge said that it would be illogical to read the provision as requiring physicians to endanger the life of the woman at the same time as trying to save it by performing a therapeutic abortion. This analysis is persuasive here, and we accept it.

Plaintiffs also argue that § 6(1) is void for vagueness. Certainly it does not set out specific medical procedures to be followed. The cure, however, would be worse than the disease. Assuming that the legislature could identify procedures which should be used in every post-viability abortion, it could not predict changes or advances in medical technology that would affect the standard of care. The standard of care may also vary from one community to another, and may depend on the practical facilities reasonably available to the physician. In *Wade, Bolton* and *Danforth,* the Court repeatedly upheld provisions which create medical criteria and leave discretion in the hands of the attending physician, such as the definition of viability. Section 6(1) also creates a medical standard and requires physicians to abide by it, although no specific definition of that medical standard is given. Consistent with the directives of the Court's abortion decisions, § 6(1) is not unconstitutionally vague. Abortion statutes may not place the physicians in a straitjacket in the practice of their profession.

Finally, plaintiffs argue that the standard of care in § 6(1) prohibits all post-viability abortions if physicians must exercise the same standard of care as they must if the fetus were intended to be born. The best care for the fetus, they contend, is to remain in the uterus until labor naturally begins. This contention stretches § 6(1) beyond recognition. Clearly, it contemplates that abortions after viability may be performed when necessary to preserve the life or health of the mother. Again, § 6(1) means that the physician must exercise that standard of care toward the fetus which is consistent with his or her primary duty to care for the mother.

---

**12.** By implication, plaintiffs agree that when there is no conflict between the needs of the woman and the needs of the fetus, it is not improper for the state to insist that the physician be responsible for caring for the fetus as well as for the woman. Certainly the physician has the duty to care for both at a normal delivery. Nor do plaintiffs disagree with the state's power to punish physicians who, after the abortion is over and the viable fetus survives, intentionally fail to exercise reasonable care for the fetus, resulting in its death. The focus of plaintiffs' challenge is on § 6(1) as it requires a physician to modify his or her procedures during an abortion.

**13.** The problems of the physicians' duties toward the fetus are thoughtfully explored in Note, *Medical Responsibility of Fetal Survival Under Roe and Doe,* 10 Harv.Civ.Lib.-Civ.Rt. Rev. 444 (1975).

### H. *Prohibition of Fetal Research*

 Two sections of the Act concern research and experimentation with fetuses and with aborted tissue. Section 6(3) provides that

"No person shall use any fetus or premature infant aborted alive for any type of scientific, research, laboratory or other kind of experimentation either prior to or subsequent to any abortion procedure except as necessary to protect or preserve the life and health of such premature infant aborted alive."

Section 12 provides that

"All tissue removed at the time of abortion shall be submitted for analysis and tissue report to a board eligible or certified pathologist as a matter of record in all cases. There shall be no exploitation of or experimentation with the aborted tissue."

These provisions do not impose any burden on the woman who is deciding whether to terminate her pregnancy. They do not place any prior obstacle in the path of the attending physician, although they do require the physician to submit the aborted tissue to a pathologist for analysis. Plaintiffs do not argue that this duty would have the effect of discouraging abortions. Since these two provisions do not infringe on a fundamental right, they are subject to a less demanding test of rationality. They are within the category of social and health matters which states are given broad latitude to regulate. *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Barsky v. Board of Regents of University,* 347 U.S. 442, 449, 74 S.Ct. 650, 98 L.Ed. 829 (1954). Plaintiffs contend that §§ 6(3) and 12 infringe on the rights of medical researchers to engage in research free from unreasonable governmental interference. There are no medical researcher plaintiffs, and, in any event, the rights of medical researchers are not fundamental under the Constitution, and are not entitled to the derivative constitutional protection afforded attending physicians of pregnant women seeking abortions. In order to invalidate §§ 6(3) and 12 under the due process clause of the Fourteenth Amendment, plaintiffs must demonstrate that there is no rational connection between the regulation and the state's interest in regulating the practice of medicine, *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). Plaintiffs have failed to meet their burden and have failed to show that a genuine fact issue exists requiring a trial. Plaintiffs cite regulations promulgated by the United States Department of Health, Education and Welfare, but these regulations undercut their position. They provide that research involving a dead fetus shall be conducted only in accordance with state and local law, and that other types of research should be permitted only if the purpose is to develop important biomedical knowledge which cannot be obtained by any other method. 45 C.F.R. § 46.209–210 (1975); Aff. of Dr. Nadler. We conclude that §§ 6(3) and 12, whether or not wise, are constitutional.

### I. *Termination of Parental Rights*

Section 7 of the Act provides that

"where a live born infant results from an attempted abortion which was not performed to save the life or health of the mother, such infant shall be an abandoned ward of the state . . . and the mother and father, if he consented to the abortion, of such infant shall have no parental rights or obligations whatsoever relating to such infant."

Section 7 also requires the attending physician to notify the juvenile court of the infant's existence.

The court in *Doe v. Rampton,* 366 F.Supp. 189, 193 (D.Utah 1973), voided a similar provision because it threatened every woman with termination of parental rights without due process of law.

 Plaintiffs contend that § 7 is unconstitutional because it deprives the parents of their parental rights in the child without due process of law and because it creates an irrebuttable presumption of un-

fitness.[14] We agree with the first contention and find it unnecessary to reach the second. *Compare Miller v. Carter,* 547 F.2d 1314, 1317 (7th Cir. 1977).

■ All parents have constitutionally protected rights to have custody of and to care for their children. They may not be deprived of their parental rights without procedural due process of law. They must have adequate notice that the state proposes to remove the children, and an opportunity to prove their fitness as parents at a hearing. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1971).

Defendants' justifications of § 7 are without merit. First, defendant Carey alleges that although the child is deemed abandoned, the parents of a child who survives an abortion may petition for restoration of parental rights in Juvenile Court under Ill. Rev.Stat., ch. 37, § 705–8(3). Assuming that parents of the child could undo the abandonment, a post-termination hearing still does not comply with the requirements of the due process clause. In *Stanley,* the Court dismissed a similar argument in the context of a statute terminating unmarried fathers' parental rights after the death of the mother without a prior hearing.

"We reject any suggestion that we need not consider the propriety of the dependency proceeding that separated the Stanleys because Stanley might be able to regain custody of his children as guardian or through adoption proceedings. . . This Court has not, however, embraced the general proposition that a wrong may be done it if can be undone." *Id.* 405 U.S. at 647, 92 S.Ct. at 1210.[15]

Second, defendant Carey suggests that the state's responsibility to provide for the child's welfare is a legitimate reason for delaying the hearing until after parental rights are terminated. It is true that the state may terminate rights without prior procedural due process in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The survival of a child after an abortion may be unexpected, but it is not an extraordinary situation that excuses the normal due process safeguards. Other statutory duties adequately preserve the infant's welfare. The physician has an immediate duty to take measures to protect the life of the infant under § 6(1). Parents who do not want to keep the child may voluntarily give up the child for adoption, and this decision is permanent three days after the child is born. Ill.Rev.Stat., ch. 4, § 9.1–9 (1975). The

14. In *Danforth,* the Court refused to decide whether a similar provision in the Missouri abortion statute was constitutional because the physician-plaintiffs lacked standing to challenge it. *Danforth, supra,* 428 U.S. at 62 n. 2, 96 S.Ct. 2831.

15. We have not overlooked the recent school corporal punishment case, *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The Supreme Court held in part that although excessive corporal punishment implicates a liberty interest, post-deprivation tort remedies provide all the process which is constitutionally due. Whether or not this decision signals a retreat from the Court's view that procedural safeguards are normally required before the deprivation, we are confident that the result in *Wright* does not affect the vitality of *Stanley* and would not govern the deprivation of parental rights in § 7 of the Illinois Abortion Act.

According to the prevalent common law, teachers have long been privileged to use such force as is reasonably necessary to control schoolchildren, even though the use of force intrudes upon the personal security of the child. If teachers use excessive force, they may be liable for damages. In *Wright,* the Court found as a matter of fact that instances of abuse are rare. It also found that the need to maintain order in classrooms makes hearings before the infliction of corporal punishment impractical. The Court noted that if the common law privilege did not exist, "the case for requiring advance procedural safeguards would be strong indeed."

No comparable reasons justify the termination of parental rights without advance procedures to protect the parent from an erroneous deprivation. There is no analogous common law privilege. There are no facts available to determine whether most parents of fetuses who survive abortions are fit or not. The only state interest justifying termination of rights without due process of law is the state's interest in protecting the fetus, and this interest is met through less drastic remedies.

state may bring proceedings against parents who neglect their children. The automatic termination of parental rights is too harsh and is not needed to insure that a child who survives an abortion is given proper care.[16]

██ Dr. Diamond contends that § 7 does not terminate parental rights without due process of law because § 8, which provides that a woman seeking an abortion after viability must be informed of § 7, gives her adequate notice. Dr. Diamond reasons that since the woman who wishes to retain parental rights can forego the abortion, she receives notice satisfying the constitutional requirement. This argument is incorrect for two reasons. First, § 8 provides for notice only after viability and § 7 terminates parental rights in abortions before viability. The woman who is subject to the deprivation therefore would not receive notice of it. Second, even if § 8 required notice of termination of parental rights to all women seeking abortions, that notice would only satisfy the first requisite of procedural due process. The parents would still need an opportunity to contest the termination by proving that they were fit.

Section 7 violates the due process clause of the Fourteenth Amendment and must be stricken. Section 8 is illogical because it requires that a woman be informed of information which could not possibly apply to her. And since it incorporates a constitutionally infirm provision, it, too, must be stricken.

### J. Ban on Saline Abortions

██ Section 9 prohibits abortions after the first trimester which are induced by inserting a saline or other fluid into the amniotic sac for the purposes of killing the fetus and artificially inducing labor. Section 9 is predicated on a legislative finding that this method, known as saline amniocentesis, is harmful to maternal health.

Plaintiffs contend that § 9 is unconstitutional because it is not rationally related to maternal health and because it amounts to a ban on all abortions after the first trimester. Further, they rely upon the decision in *Danforth* striking a comparable ban on saline abortions in the Missouri Abortion Act.

To analyze this argument, it is necessary to review some of the uncontested facts about saline amniocentesis. According to the report submitted by plaintiffs, National Academy of Sciences, *Legalized Abortion and the Public Health* (1975), saline abortions are usually performed after the 15th week of pregnancy. Some amniotic fluid is withdrawn from the uterine cavity by a needle inserted through the abdominal wall and this fluid is replaced with a concentrated salt solution. This process induces labor and the fetus is expelled from the uterus, usually dead, 24 to 48 hours after the injection. *Id.* at 139. Saline abortions expose the woman to the risk of complications. Placental tissue may be retained in the uterus. Infection and hemorrhage may result. *Id.* at 54. The blood clotting mechanism may be disturbed. It is also possible that the saline solution will enter the blood stream, damaging the central nervous system or causing convulsions. *Id.* at 48; *Danforth, supra,* 428 U.S., at 95–96, 96 S.Ct. 2831 (White, J., dissenting). These complications present a risk to the woman's health.

Another method of performing abortions which may be used after the first trimester is hysterotomy, a surgical entry into the uterus, similar to a cesarean section, in which the fetus is removed. *Legalized Abortion, supra,* at 138. All parties agree that this method poses a substantially greater risk of complications and death to the woman than saline abortions. Because of this increased danger, hysterotomy is not an adequate substitute for saline amniocentesis.

---

**16.** Other states have passed legislation which would provide for voluntary termination of parental rights if the fetus survives an abortion, or voluntary termination of parental rights upon approval by a state court or agency. *See* Wis.Stat. § 48.40 (West 1957); Minn.Stat. § 145.415 subd. 3 (Supp. 74); See Note, *Medical Responsibility for Fetal Survival After Roe and Doe,* 10 Harv.Civ.Rt.-Civ.Lib.L.Rev. 444, 466 n.104 (1975).

The third method of performing abortions after the first trimester is chemical induction of labor by injection of a prostaglandins solution into the amniotic sac. This process is similar to that used in saline abortions, but the risk to the woman is not as great. The fetus is expelled from the uterus sooner after the injection than is the case in saline abortions. Complications from prostaglandins include vomiting and diarrhea, but there appears to be no risk to the central nervous system if the prostaglandins enter the bloodstream. *Id.* at 48. Use of prostaglandins is a relatively new technique. The FDA approved the drug for manufacture in November, 1973.

The Supreme Court's opinion in *Danforth* striking the ban on saline abortions must be read against this factual background. Justice Blackmun wrote the plurality opinion which was joined by two other justices. This opinion rested on several factual grounds. The Court found that the only safe alternative method for abortions after the first trimester was use of prostaglandins, but this drug was not yet readily available to women in Missouri. The Court also reasoned that since the ban on saline abortions covered injection of "a saline or other fluid" into the amniotic sac, it might be construed to prohibit prostaglandins as well. Women in Missouri would then be left with no safe method for abortions after the first trimester.[17] Moreover, the Court said that saline amniocentesis was a widely used method and that it was safer than childbirth, at least with respect to maternal mortality. The Court concluded that if saline abortions were stopped, a woman seeking an abortion after the first trimester would be forced to undergo a hysterotomy. A regulation barring a relatively safe procedure but permitting a much more risky one is not rationally related to maternal health and is therefore unconstitutional. *Danforth, supra,* 428 U.S., at 75–79, 96 S.Ct. 2831.

Two justices joined Justice Stevens, who concurred on narrower grounds that the ban on saline was unconstitutional. His reasoning was that the ban on saline barred most abortions after the first trimester, because prostaglandins were unavailable to women in Missouri at the time. Justice Stevens noted that if two procedures were equally available to the woman, the state could constitutionally prohibit one of them.

The holding of the Court is the "position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977); *Gregg v. Georgia,* 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Six justices in *Danforth* agreed that the ban on saline is not rationally related to maternal health because the only safe alternative method is not widely available. Plaintiffs now concede that prostaglandins are now more widely available to women in Illinois. Supplemental Brief for Plaintiffs at 14. However, they contend that prostaglandins are not available to some women in the sense that they are medically unsafe for women with certain physical conditions. Therefore, they assert that the state may not prohibit saline abortions because doing so would deprive women who cannot undergo prostaglandin abortions of their opportunity to have an abortion after the first trimester.

A superficial examination of the affidavits and depositions filed in this case suggests that a genuine issue of material fact exists respecting the safety of prostaglandins for all women. Defendants proffer the affidavit of Dr. Anderson, Chief of Obstetrics at Yale University, who states that he cannot foresee a case in which prostaglandins would be contraindicated and a saline abortion would be safer.[18] Plaintiffs rely

---

17. Plaintiffs assert that a similar interpretation of § 9 of the Illinois Act would prohibit prostaglandin abortions. Defendants' response is that "other fluid" merely means other names for a saline solution. This is a weak explanation, but it is unnecessary to rely on this

ground since the ban on saline is void for the reasons explained in the text, *infra.*

18. Plaintiffs' motion to strike defendants' affidavits does not include Dr. Anderson's affida-

on the opinion of Dr. Motew, who stated that prostaglandins are contraindicated in women who have previously given birth by cesarean section because the strong contractions induced by prostaglandins create a risk of uterine rupture not present using the saline method. Deposition of Dr. Motew at 38–40.

Nevertheless, some undisputed facts show there are indeed certain situations in which the saline method is preferable to use of prostaglandins. According to the affidavits and exhibits, plaintiffs and defendants agree that the description of Prostin F2 alpha [19] prepared by Upjohn Company is accurate and has been approved by the Food and Drug Administration. Plaintiffs have attached this description of prostaglandins to their motion for summary judgment and defendants have submitted the affidavit of James Folkertsma, who is authorized by Upjohn Company to make representations concerning the FDA approval, use and availability of this drug.

According to the description, use of prostaglandins is contraindicated in women who have acute pelvic inflammatory disease and in women who are hypersensitive to the drug.[20] The description also indicates that prostaglandins should be used with caution in patients with a history of asthma, glaucoma, hypertension, cardiovascular disease, or past history of epilepsy. The instructions as to dosage and administration recommend that the physician inject a small amount of the drug slowly before proceeding to determine possible sensitivity to prostaglandins. Finally, the description states that in a group of 229 patients, 14% failed to abort completely. When a prostaglandins abortion is incomplete, other measures should be taken to assure complete abortion, and the method contemplated is saline amniocentesis.

Defendants have admitted that the statements made on the Upjohn description of prostaglandins are accurate. The unmistakable inference from the comments therein is that prostaglandins cannot be regarded as a completely effective substitute for saline abortions in all cases. Therefore, the two methods of abortion are not equally available to women and the state cannot, consistent with the holding of the Court in *Danforth,* prohibit saline abortions. Section 9 of the Illinois Abortion Act is therefore unconstitutional.

### K. Reporting Requirements

■ Section 10 of the Act imposes record keeping requirements. It provides in full:

Section 10. A report of each abortion performed shall be made to the Department on forms prescribed by it. Such report forms shall not identify the patient by name, but shall include, but not be limited to, information concerning:

(a) Identification of facility where abortion was performed and date performed;

(b) The political subdivision in which the patient resides;

(c) Patient's date of birth, race and marital status;

(d) Number of prior pregnancies;

(e) Date of last menstrual period;

(f) Type of abortion procedure performed; and

(g) Complications.

Such form shall be completed by the hospital or other licensed facility, signed by the attending physician, and transmitted to the Department not later than 10 days following the end of the month in which the abortion was performed.

Abortions performed after a gestation period of 20 completed weeks shall be registered as provided in Sections 20 through 24 of the Vital Records Act.

---

vit, which plaintiffs apparently find unobjectionable.

**19.** Prostin F2 alpha is the trademark for Prostaglandin F2 alpha, which is the drug distributed by Upjohn for inducing abortions.

**20.** None of the parties have indicated whether women with acute pelvic inflammatory disease can undergo a saline abortion, and we make no finding in that regard.

The Department may prescribe rules and regulations regarding the administration of this Act including regulations relating to the information to be provided under Section 20 of the Vital Records Act.

All information obtained by a physician, hospital or ambulatory health facility from a patient for the purpose of preparing reports to the Department under this Section or reports received by the Department shall be confidential and shall be used for statistical purposes except where otherwise provided by law.

Plaintiffs contend that the record keeping requirements are unconstitutional because they add an extra layer of regulation upon abortion practices which are not applicable to any other medical procedure; because they apply to the first trimester of pregnancy; because they are overly burdensome; because they infringe upon the physician-patient relationship; and because they fail to adequately safeguard the patient's right to privacy.

In *Danforth,* the Court upheld the record-keeping requirements in the Missouri abortion statute on the ground that record keeping aids the state's interest in preserving maternal health, and that it can provide useful data for making medical decisions. The Court rejected claims that the provision was unconstitutional because it added an extra layer of regulation and because it applied to first trimester abortions. *Danforth,* 428 U.S. at 79–81, 96 S.Ct. 2831. The Court sketched limits to permissible record-keeping, and said that it must not discourage abortions indirectly by imposing a "sheer burden of administrative detail." Additionally, record keeping requirements must "properly respect a patient's confidentiality and privacy." *Id.* at 80–81, 96 S.Ct. at 2846.

Section 10 of the Illinois Act differs from the Missouri statute in two significant respects. First, § 10 is more specific than the requirements in the Missouri statute and lists seven items which must be included in the report for each abortion. Yet this list is not unconstitutionally burdensome. The information can be assembled quickly and recorded on forms. The abortion reports will generate information which will be useful in learning about the impact of abortion on maternal health. Although § 10 is open-ended concerning the information to be reported, we assume, as did the Court in *Danforth,* that the Illinois Department of Public Health will not interpret § 10 to require a burdensome amount of detail.[21]

The second difference between § 10 and the reporting requirements in the Missouri abortion statute concerns the preservation of confidentiality. The Missouri statute provided that the abortion report shall be kept confidential. Section 10 provides that the abortion report shall be kept confidential except as otherwise provided by law. Section 10 itself provides otherwise, because it requires that each abortion performed after 20 weeks of gestation shall be recorded as a fetal death under the Vital Records Act, Ill.Rev.Stat., ch. 111½, § 73–1 *et seq.* (1975).[22] A fetal death report includes the name of the woman. Most damaging, reports of Vital Records are available upon request to a number of persons other than state officials compiling statistics. Anyone having a personal or property interest, members of Illinois genealogical societies, private agencies, and bona fide researchers not working for private gain are among the people who may request access to vital records and learn the name of the woman who

**21.** The Department is charged with prescribing forms for the abortion report. Plaintiffs have attached a copy of a "Certificate of Termination of Pregnancy" to their reply brief. Since plaintiffs' attack is against the Act on its face rather than as it might be applied, the constitutionality of this form is not before us.

**22.** Fetal death is defined as death prior to the complete expulsion or extraction from its

mother of a product of human conception, irrespective of the duration of pregnancy. The death is indicated by the fact that after such separation the fetus does not breathe or show any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definitive movement of voluntary muscles. Ill.Rev. Stat., ch. 111½, § 73–1(6) (1975).

has an abortion after the 20th week of gestation.

This possibility of disclosure is far from innocuous and could damage the woman's right to privacy in at least two ways. First, highly personal information about the woman may be publicly revealed. To the extent that abortions past midterm are stigmatizing, disclosure could damage a woman's reputation. Second, the chance of disclosure could indirectly affect a woman's independence in deciding whether to have the abortion. A woman might choose not to have an otherwise necessary abortion if she knew that her decision could become virtually a matter of public record. *See Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 876–78, 51 L.Ed.2d 64 (1977).[23]

It is no answer to suggest that if fetal death certificates for women who spontaneously abort are constitutional, then the same regulations may include women who deliberately have an abortion. A woman past the 20th week of pregnancy who voluntarily chooses to terminate the pregnancy faces a much more serious invasion of privacy if her choice becomes public knowledge. Therefore, the two sentences of § 10 of the Illinois Abortion Act which refer to and incorporate the Vital Records Act are unconstitutional.

### L. *Criminal Penalties*

Plaintiffs have raised arguments directed at all of the criminal provisions of the Act, which establishes a number of overlapping criminal penalties. Section 2(6) defines criminal abortion as,

"the use of any instrument, medicine, drug, or other substance, whatever, with the intent to procure a miscarriage of any woman except when done by a physician in conformity with this Act." [24]

Section 11(a) provides that "a person who commits a criminal abortion is guilty of a Class 2 felony." Plaintiffs allege that § 2(6) violates the due process clause of the Fourteenth Amendment because it is vague and because it punishes unintentional conduct.

■ The due process clause requires that criminal statutes be clearly defined so that persons have a reasonable opportunity to conform their conduct to the law. *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The absence of a definition of "miscarriage" in the definition of criminal abortion gives rise to a true vagueness problem. Because this critical term is not defined, physicians cannot tell what conduct is prohibited.

The word "miscarriage" causes vagueness problems for the following reasons. First, the definition of miscarriage suggested by defendants, which is the most commonly accepted definition of the word, though precise enough, is so inconsistent with the rest of the Act that as a matter of statutory construction, it cannot possibly be correct. Second, any other conceivable definition of

---

**23.** In *Whalen,* the Court upheld a statutory system whereby names of users of certain drugs were recorded in a centralized computer file. Since the statute and regulations provide for an elaborate security system, with disclosure to the names rigidly limited to certain public health officials, the Court found the threat to the users' privacy rights too insubstantial to violate the Fourteenth Amendment. In passing, the Court said that many other examples of medical record keeping requirements, such as fetal death certificates, are constitutional because they are an essential part of modern medical practice. It could be argued that the Court would therefore approve of the fetal death certification procedure established in § 10 of the Illinois Act. The Court's choice of examples, however, does not override the

holding in *Danforth* that the name of the woman having the abortion must be kept confidential.

**24.** Elsewhere in this opinion, we have held the following provisions unconstitutional: clauses (a) and (b) of § 3(2), § 3(3), § 3(4), the second clause of § 5(2), § 7, § 8, § 9, and § 10 to the extent that it incorporates the Vital Records Act. All of these provisions burden constitutionally protected rights. A state may not criminalize constitutionally protected conduct, and hence the phrase in § 2(6), "except when done . . . in conformity with this Act," must be construed as only incorporating the constitutionally valid provisions of the Act.

miscarriage is either impermissibly vague or stretches § 2(6) beyond recognition.

Defendants suggest that according to *Schmidt's Attorneys Dictionary of Medicine* (1973), a miscarriage is the expulsion from the uterus of the developing infant or fetus before it has developed enough to be able to remain alive. *Blakiston's New Gould Medical Dictionary* (1956) defines miscarriage as expulsion of the fetus before it is viable. *Webster's Third New International Dictionary* defines miscarriage as expulsion of a human fetus before it is viable, especially between the 12th and 14th weeks of gestation. Thus, the term "miscarriage" contemplates the expulsion of a fetus which is incapable of surviving.

This definition is not vague. Nor is it overinclusive. It is, in fact, so underinclusive that it is inconsistent with some of the specific provisions of the Act, and with its general purpose. Under this definition, a physician could not be punished for failure to comply with certain of the abortion regulations in abortions performed after the fetus is viable. A physician who performed an abortion after viability in an abortion clinic could not be convicted for failure to perform the abortion in a hospital pursuant to § 4. A physician who failed to file an abortion report in a post-viable abortion could not be convicted for failure to comply with § 10. A physician who failed to submit aborted tissue to a pathologist when performing a post-viable therapeutic abortion could not be convicted for failure to comply with § 12.[25] The consequence would be that in these respects, second trimester abortions would be more highly regulated than abortions after viability. In view of the important state interest in fetal life after viability, and in view of §§ 5(2) and 6(1), which purport to regulate abortions after viability, it is illogical to assume that the legislature drew a distinction which would result in less regulation after the fetus became viable. Yet that is the logical result of defendants' proposed definition of miscarriage.

Another possibility for defining miscarriage is found in an appendix to *Legalized Abortion and the Public Health* (1975). There, miscarriage is defined as a spontaneous abortion, or an abortion that occurs naturally without being deliberately induced. If this definition is substituted for miscarriage in § 2(6), the result is circular and contradictory. An abortion then means an induced but spontaneous abortion.

Perhaps a miscarriage should be defined as an artificial termination of pregnancy. This definition would include abortions after viability, but it would not adequately distinguish between abortions and procedures used to assist at birth, or procedures intended to induce an early delivery. Certainly the distinction cannot turn on whether the fetus survives or is born alive. If that were the determining factor, it would be impossible for a physician to determine until after the fact whether he had performed an abortion or attended at a delivery.

The vagueness lurking in § 2(6)'s definition of criminal abortion is more than a verbal conundrum. It highlights the point that the distinction between abortion and delivery is one of intent.[26] Abortion statutes which define abortion in terms of the intent of the physician avoid the ambiguity of the word "miscarriage." For example, the Missouri abortion statute in *Danforth* defined abortion as "the intentional destruction of the life of an embryo or fetus in his or her mother's womb or the intentional termination of the pregnancy of a mother with an intention other than to

---

25. Failure to obtain informed consent is made a crime in § 3(2), if § 2(6) does not apply to abortions after viability, it is clear that a physician must still secure the informed consent of the woman before performing the abortion. It is uncertain, however, whether failure to secure an informed consent for an abortion after viability is a misdemeanor under § 3(2), a felony under § 11(a), or both.

26. In § 6(1) of the Illinois Abortion Act, the standard of care required toward the viable fetus is contrasted with the standard of care due a fetus "intended to be born and not aborted." This provision, unlike § 2(6), distinguishes between abortion and delivery on the basis of intent.

increase the probability of a live birth or to remove a dead or dying unborn child." In *Doe v. Rampton,* 366 F.Supp. 189 (D.Utah 1973), the abortion statute, which was entirely stricken on other grounds, defined abortion as "the termination of human pregnancy with an intent other than to produce a live birth or to remove a dead fetus, and includes all procedures undertaken to kill a live fetus and includes all procedures undertaken to produce a miscarriage." In *Word v. Poelker,* 495 F.2d 1349 (8th Cir. 1974), the ordinance under attack defined abortion as "the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus." All these definitions clearly describe the mental state which distinguishes a late-term abortion from a delivery or attempted delivery.[27]

It could be argued that § 2(6) should be construed to include the specific intent to terminate a pregnancy with an intention other than to increase the chance of a live birth, or some other variant of the same theme, if such a construction would avoid the constitutional vagueness problem. Clearly a court has the obligation to construe a statute as constitutional whenever possible. *United States v. Vuitch,* 402 U.S. 62, 71, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971). But a court cannot rewrite a statute under the guise of construing it. Judicial construction of a criminal statute cannot add an element which is not there. If the Illinois legislature wishes to insure that the substantive provisions of the abortion statute are followed by creating criminal penalties for noncompliance, it must do so with language which clearly defines the conduct which is prohibited. Because the word miscarriage which is used in the definition of

criminal abortion is itself undefined and because § 2(6) is vague as a result, § 2(6) is unconstitutional and must be stricken. Its companion § 11(a) which makes criminal abortion a Class 2 felony must also fall.

█ Plaintiffs have alleged that the criminal penalties in § 6(1) and § 6(2) are vague because they also include undefined terms. These sections provide:

(1) No person who performs or induces an abortion after the fetus is viable shall fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted. Any physician or person assisting in the abortion who shall intentionally fail to take such measures to encourage or to sustain the life of viable fetus or child, and the death of the viable fetus or the child results, shall be deemed guilty of a Class 2 felony.

(2) Whoever, with intent to do so, shall take the life of a premature infant aborted alive, shall be guilty of a Class 1 felony.

Section 6(1) includes the words "viable fetus" and "child" which are undefined, and § 6(2) includes the words "premature infant aborted alive," which is undefined. Viable, of course, is defined in § 2(2), and this definition is not unconstitutionally vague. We can perceive only one difficulty with the absence of definitions for the remaining terms. It is uncertain what life signs must exist to activate the duties and the criminal penalties in § 6(2). If the aborted fetus exhibits only minimal life signs and does not survive long, then it is unlikely that its death could be criminally attributed to the

---

**27.** Other statutes, it is true, have not defined abortion any more clearly than § 2(6) of the Illinois Act. In several instances, however, the court deciding the challenge to the statute voided it on other grounds. *E. g., Leigh v. Olson,* 385 F.Supp. 255 (D.N.D.1974) (Every person who . . . uses . . . any instrument or other means whatever, with intent thereby to procure the miscarriage of such [pregnant] woman, . . . shall be punished . .); *YWCA of Princeton, N. J. v. Kugler,* 342

F.Supp. 1048, 1062 (D.N.J.1972) (any person who . . . with intent to cause . . . the miscarriage of a pregnant woman . . . or uses any . . . means, . . . is guilty . . .); *Henrie v. Derryberry,* 358 F.Supp. 719 (N.D.Okl.1973) (every person who . . uses . . . any instrument, or other means whatever, with intent to procure the miscarriage of such woman, . . . . is punishable . . .).

physician. If the fetus is simply too small to survive given reasonable medical care, then the physician performing the abortion could not be guilty of intentional conduct resulting in the death of the fetus within the meaning of §§ 6(1) or 6(2). In short, though "aborted fetus" is undefined, there is no doubt as to the conduct which is required.

Plaintiffs also assert that the criminal penalties in the Act punish unintentional conduct. Since we hold § 2(6) void for vagueness, it is unnecessary to analyze this contention with respect to that provision. Three of the remaining criminal provisions include a specific mental state and do not therefore punish unintentional conduct. Section 3(2) punishes physicians who intentionally fail to inform the woman about to be aborted or who fail to secure a written informed consent.[28] Sections 6(1) and 6(2) both require that the conduct criminalized be intentional. Thus, with respect to these provisions plaintiffs' arguments that the abortion act punished unintentional conduct are erroneous.

Section 11(c), however, provides that

"Any hospital, licensed facility or physician who fails to submit a report to the Department under the provisions of Section 5 of the Act and any person who fails to maintain the confidentiality of any records or reports required under this Act is guilty of a Class B misdemeanor." [29]

On its face, § 11(c) does not include a mental state. But the Illinois Criminal Code establishes principles of criminal liability applicable to all criminal statutes. Ill.Rev. Stat., ch. 38, § 4–3(a) provides that a person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described in the offense, he acts while having intent, knowledge, recklessness or negligence, the mental states defined in Sections 4–4 through 4–7 of the Illinois Criminal Code. Violation of § 11(c) of the abortion act is a Class B misdemeanor. Persons found guilty of Class B misdemeanors may be punished by incarceration. Section 4–9 of the Illinois Criminal Code states that an offense punishable by incarceration is not an absolute liability offense unless the statute defining the offense clearly indicates a legislative purpose to impose absolute liability. No clear legislative purpose to that effect exists in § 11(c) of the Act. Therefore, § 4–3(a) of the Criminal Code applies to § 11(c) of the Illinois Abortion Act and plaintiffs' argument that § 11(c) does not require a mental state is erroneous.

We conclude that § 2(6) and § 11(a) are unconstitutional, but that the criminal penalties in § 3(2), § 6(1), § 6(2) and § 11(c) are constitutional.

## CONCLUSION AND RELIEF

In sum, we declare the following portions of the Illinois Abortion Act void and unenforceable because they conflict with rights guaranteed plaintiffs by the due process clause of the Fourteenth Amendment to the Constitution of the United States: § 2(6), the definition of criminal abortion; § 3(2)(a) and (b), portions of the informed consent requirement; § 3(3), spousal consent; § 3(4), parental consent; § 5(2), second clause, two-doctor concurrence; §§ 7 and 8, termination of parental rights; § 9, ban on saline abortions; § 10, insofar as it incorporates the Vital Records Act; and § 11(a), criminal abortion. A declaratory judgment shall enter to that effect. We assume that Illinois' prosecutorial authorities will recognize and abide by this judgment and, accordingly, we deny plaintiffs' prayer for injunctive relief at this time. *Wade,* 410 U.S., at 166, 93 S.Ct. 705; *Bol-*

---

**28.** It is impossible to determine whether "intentional" modifies both the failure to inform and the failure to secure a written consent, or if "intentional" just modifies the clause which immediately follows. If the former, then § 3(2) only punishes intentional conduct. If the latter, then the general criminal responsibility provisions of the Illinois Criminal Code would imply a mental state for the reasons discussed in the text, *infra.*

**29.** Plaintiffs raise no objection as to criminalizing the failure to maintain confidentiality of abortion reports.

**1332**

*ton*, 410 U.S., at 201, 93 S.Ct. 739. In all other respects plaintiffs' complaints are dismissed.

## APPENDIX

### ILLINOIS HOUSE BILL 1851
### ILLINOIS ABORTION LAW OF 1975

Section 1. It is the intention of the General Assembly of the State of Illinois to reasonably regulate abortion in conformance with the decisions of the United States Supreme Court of January 22, 1973. Without in anyway restricting the right of privacy of a woman or the right of a woman to an abortion under those decisions, the General Assembly of the State of Illinois do solemnly declare and find in reaffirmation of the longstanding policy of this State, that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and Constitution of this State. Further, the General Assembly finds and declares that longstanding policy of this State to protect the right to life of the unborn child from conception by prohibiting abortion unless necessary to preserve the life of the mother is impermissible only because of the decisions of the United States Supreme Court and that, therefore, if those decisions of the United States Supreme Court are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the former policy of this State to prohibit abortions unless necessary for the preservation of the mother's life shall be reinstated.

Section 2. Unless the language or context clearly indicates a different meaning is intended, the following words or phrases for the purpose of this Act shall be given the meaning ascribed to them:

(1) "First trimester" means the first twelve weeks of gestation commencing with ovulation rather than computed on the basis of the menstrual cycle.

(2) "Viability," that stage of fetal development when the life of the unborn child

may be maintained outside the womb by natural or artificial life-supportive systems.

(3) "Physician," any person licensed to practice medicine in all its branches under the Illinois "Medical Practice Act."

(4) "Hospital" means a hospital licensed pursuant to the "Hospital Licensing Act" or specifically exempted from licensure under subsections (2), (3), or (4) of Section 3 of this Act.

(5) "Department" means the Department of Public Health, State of Illinois.

(6) *"Criminal Abortion" means the use of any instrument, medicine, drug or other substance, whatever, with the intent to procure a miscarriage of any woman except when done by a physician in conformity with this Act. It shall not be necessary in order to commit a criminal abortion that the woman be pregnant, or if pregnant, that a miscarriage be accomplished.*

Section 3. No abortion shall be performed prior to the end of the first trimester of pregnancy except:

(1) By a duly licensed, consenting physician in the exercise of his best clinical medical judgment;

(2) After the woman, prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion. The informed consent shall state that the woman has been informed of the following:

(a) *The physical competency of the fetus at the time the abortion is to be performed, such as, but not limited to, what the fetus looks like, fetus ability to move, swallow, and its physical characteristics;*

(b) *The general dangers of abortion, including, but not limited to, the possibility of subsequent sterility, premature birth, live-born fetus, and other dangers;* and

(c) The particular dangers of the procedure to be used.

Any physician who intentionally fails to inform the woman about to be aborted or

who fails to secure a written informed consent as indicated herein, violates the provisions of this Act and commits a Class B misdemeanor.

Any violation of this Section shall be admissible in a civil suit as prima facie evidence of the physician's failure to obtain an informed consent;

(3) *With the written consent of the woman's spouse, unless the abortion is certified by a licensed physician to be necessary in order to preserve the life or health of the mother.*

(4) *With the written consent of one parent or person in loco parentis of the woman if the woman is unmarried and under the age of 18 years, unless the abortion is certified by a licensed physician as necessary in order to preserve the life or health of the mother.*

Section 4. No abortion performed subsequent to the first trimester of pregnancy shall be performed except where the provisions of Section 3 of this Act are satisfied and the abortion is performed in a hospital, on an inpatient basis, with measures for life support for the fetus which must be available and utilized, if there is any clearly visible evidence of viability.

Section 5.

(1) No abortion not necessary to preserve the life or health of the mother shall be performed unless the attending physician first certifies with reasonable medical certainty that the fetus is not viable.

(2) When the fetus is viable no abortion shall be performed unless medically necessary to preserve the life or health of the mother *and only after consultation with at least two other physicians not related to or engaged in practice with the attending physician.*

Section 6.

(1) No person who performs or induces an abortion after the fetus is viable shall fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not

aborted. Any physician or person assisting in the abortion who shall intentionally fail to take such measures to encourage or to sustain the life of viable fetus or child, and the death of the viable fetus or the child results, shall be deemed guilty of a Class 2 felony.

(2) Whoever, with intent to do so, shall take the life of a premature infant aborted alive, shall be guilty of a Class 1 felony.

(3) No person shall use any fetus or premature infant aborted alive for any type of scientific, research, laboratory or other kind of experimentation either prior to or subsequent to any abortion procedure except as necessary to protect or preserve the life and health of such premature infant aborted alive.

Section 7. *In every case where a live born infant results from an attempted abortion which was not performed to save the life or health of the mother, such infant shall be an abandoned ward of the State under the jurisdiction of the juvenile court wherein the abortion occurred, and the mother and father, if he consented to the abortion, of such infant shall have no parental rights or obligations whatsoever relating to such infant. The attending physician shall forthwith notify said juvenile court of the existence of such live born infant.*

Section 8. *Any woman seeking an abortion in the State of Illinois, after viability, shall be verbally informed of the provisions of Section 7 of this Act by the attending physician and the woman shall certify in writing that she has been so informed.*

Section 9. *The General Assembly finds that the method or technique of abortion known as saline amniocentesis whereby the amniotic fluid is withdrawn and a saline or other fluid is inserted into the amniotic sac for the purpose of killing the fetus and artificially inducing labor is deleterious to maternal health and is hereby prohibited after the first trimester of pregnancy.*

Section 10. A report of each abortion performed shall be made to the Department

on forms prescribed by it. Such report forms shall not identify the patient by name, but shall include, but not be limited to, information concerning:

(a) Identification of facility where abortion was performed and date performed;

(b) The political subdivision in which the patient resides;

(c) Patient's date of birth, race and marital status;

(d) Number of prior pregnancies;

(e) Date of last menstrual period;

(f) Type of abortion procedure performed; and

(g) Complications.

Such form shall be completed by the hospital or other licensed facility, signed by the attending physician, and transmitted to the Department not later than 10 days following the end of the month in which the abortion was performed.

*Abortions performed after a gestation period of 20 completed weeks shall be registered as provided in Sections 20 through 24 of the Vital Records Act.*

The Department may prescribe rules and regulations regarding the administration of this Act *including regulations relating to the information to be provided under Section 20 of the Vital Records Act.*

All information obtained by a physician, hospital or ambulatory health facility from a patient for the purpose of preparing reports to the Department under this Section or reports received by the Department shall be confidential and shall be used for statistical purposes *except where otherwise provided by law.*

Section 11.

(a) *A person who commits a criminal abortion is guilty of a Class 2 felony.*

(b) Any person who advertises, prints, publishes, distributes or circulates any communication through print, radio or television media advocating, advising or suggesting any act which would be a violation of this Act is guilty of a Class B misdemeanor.

(c) Any hospital, licensed facility or physician who fails to submit a report to the Department under the provisions of Section 5 of the Act and any person who fails to maintain the confidentiality of any records or reports required under this Act is guilty of a Class B misdemeanor.

(d) Any person who sells any drug, medicine, instrument or other substance which he knows to be an abortifacient and which is in fact an abortifacient, unless upon prescription of a physician, is guilty of a Class B misdemeanor.

Section 12. All tissue removed at the time of abortion shall be submitted for analysis and tissue report to a board eligible or certified pathologist as a matter of record in all cases. There shall be no exploitation of or experimentation with the aborted tissue.

Section 13. No physician, hospital, ambulatory surgical center, nor employee thereof, shall be required against his or its conscience declared in writing to perform, permit or participate in any abortion, and the failure or refusal to do so shall not be the basis of any civil, criminal, administrative or disciplinary action, proceeding, penalty or punishment. If any request for an abortion is denied, the patient shall be promptly notified.

Section 14. If any provision of this Act or the application thereof to any person or circumstance shall be held invalid, such invalidity shall not affect the provisions or application, and to this end the provisions of this Act are declared to be severable.

Section 15. This Act shall be known and may be cited as the "Illinois Abortion Act of 1975."