Allan G. CHARLES, M.D., Marvin Rosner, M.D., David Zbaraz, M.D. and Martin Motew, M.D., and on behalf of all others similarly situated, Plaintiffs,

v.

Bernard CAREY, State's Attorney for the County of Cook, Tyrone C. Fahner, Attorney General of the State of Illinois, their agents, successors and all others similarly situated and Byron Francis, M.D., Acting Director of Public Health, State of Illinois, Defendants.

The HOPE CLINIC FOR WOMEN, LTD., an Illinois corporation, Hector N. Zevallos, M.D., National Health Care Services of Peoria, Inc., an Illinois corporation, Arthur C. Watson, Jr. M.D., and Robert C. Steptoe, M.D., Plaintiffs,

v.

Tyrone C. FAHNER, Attorney General of the State of Illinois and Bernard Carey, State's Attorney of Cook County, Illinois, Defendants.

Nos. 79C4541, 79C4548.

United States District Court, N.D. Illinois, E.D.

Oct. 14, 1983.

As Amended Nov. 2, 1983.

Lois Lipton, R. Peter Carey, Merle L. Royce, II, Prentice H. Marshall, Jr., Chicago, Ill., for plaintiff Charles, et al.; Roger Baldwin Foundation of ACLU, Inc., Chicago, Ill., of counsel.

Carol Kipperman, Chicago, Ill., Frank Susman, St. Louis, Mo., for plaintiffs Hope Clinic, et al.

Richard M. Daley, State's Atty., c/o Robert Tonos, Neil Hartigan, Atty. Gen., c/o Kathleen Kreisel, Chicago, Ill., for defendants.

Thomas J. Marzen, Maura Quinlan, Americans United for Life Legal Defense Fund, Chicago, Ill., for intervening defendants.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter comes before the Court on the parties' cross motions for summary judgment. Plaintiffs seek entry of a permanent injunction against the enforcement of the Illinois Abortion Law of 1975, as amended,[1] on the grounds that the legislation is unconstitutional. Numerous sections of the legislation have already been preliminarily enjoined as a result of orders issued by Judge Flaum (Memorandum Opinion, November 16, 1979), the Seventh Circuit Court of Appeals (*Charles v. Carey*, 627 F.2d 772 (7th Cir.1980)), and by this Court *Charles v. Carey*, 579 F.Supp. 377

---

1. The legislation, commonly known as "S.B. 47," is codified at Ill.Ann.Stat. ch. 38 ¶¶ 81–11 to 81–34. (Smith-Hurd Supp.1982).

(N.D.Ill.1983). In this opinion, the constitutionality of each section shall be discussed sequentially.[2]

Section 1 of the legislation is the Preamble. Despite the clear holding of the Supreme Court in *Roe v. Wade*,[3] and reaffirmed in *City of Akron v. Akron Center for Reproductive Health*,[4] that "a State may not adopt one theory of when life begins to justify its regulation of abortions,"[5] the Preamble in the instant statute arguably attempts to do just that. It declares the General Assembly's view "that the unborn child is a human being from the time of conception and is ... entitled to the right of life from conception." However, because the Preamble also contains language which states that the legislature intended "to reasonably regulate abortion *in conformance with the decisions of the United States Supreme Court* [in *Roe v. Wade* and its companion cases]" (emphasis supplied), the Seventh Circuit has held that the Preamble does not express an unlawful purpose, when read as a whole. *Charles v. Carey*, 627 F.2d at 779. Most important, because the Preamble is largely rhetorical and effectively has little impact on the substantive provisions of this Act,[6] it does not unconstitutionally burden a woman's protected interest in obtaining an abortion.

Accordingly, Section 1 shall not be permanently enjoined.

In contrast, I find that certain portions of Section 2, the definitional section, do have an impact upon the substantive provisions of the legislation and therefore do burden a woman's choice regarding an abortion. Thus, for the reasons set forth in the earlier opinions by the Seventh Circuit[7] and this Court,[8] a permanent injunction shall issue against Sections 2(8), 2(9), and 2(10).

■ Section 2(2) defining viability was recently amended to replace the clause "more than momentary" with the word "sustained".[9] This change removes the objections found by Judge Flaum earlier, and renders the definition constitutional under *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). The preliminary injunction entered as to Section 2(2) is therefore dissolved and no permanent injunction shall issue. The remaining portions of Section 2 are not being challenged by plaintiffs at this time,[10] so they shall also stand.

Section 3.1(A) requires the doctor who is to perform an abortion to determine, for himself, that in his best clinical judgment the abortion is necessary. For the reasons set forth by this Court[11] and the Court of

---

**2.** The applicable Constitutional standards upon which my decision must be based were discussed in my earlier opinion. 579 F.Supp. at 378–379. As a general matter, because this legislation has already been subject to extensive judicial scrutiny, I shall not attempt to summarize the bases for previous holdings. Rather, the earlier opinions will be referenced.

**3.** 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**4.** —— U.S. ——, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983).

**5.** *Akron*, —— U.S. at ——, 103 S.Ct. at 2500. *See also Roe v. Wade*, 410 U.S. at 159–162, 93 S.Ct. at 729–731.

**6.** *See Wynn v. Scott*, 449 F.Supp. 1302, 1314–1315 n. 9 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir.1979).

**7.** 627 F.2d at 789. *See also* discussion *infra*.

**8.** 579 F.Supp. at 379–380.

**9.** Illinois Senate Bill 666 became law on September 17, 1983. It amends Section 2(2) of the present Act such that "'viability' means that stage of fetal development when, in the medical judgment of the attending physician based on the particular facts of the case before him, there is a reasonable likelihood of *sustained* survival of the fetus outside the womb, with or without artificial support." Thus, the word "sustained" replaces the clause "more than momentary."

**10.** *See* Plaintiffs' "Supplemental Memorandum In Support of Plaintiffs' Motion for Supplemental Judgment," July 29, 1983, Exh. A. In previous opinions, Section 2(6) defining "abortion" has been upheld. 627 F.2d at 788; 579 F.Supp. at 380.

**11.** 579 F.Supp. at 382–383.

Appeals [12] in the earlier opinions, this subsection is constitutional and shall not be enjoined.

Section 3.1(B)(1)(a) sets forth certain requirements concerning a mandatory "consultation" between the woman and the doctor who is to perform her abortion. Defendants concede that it is an unconstitutional provision after *Akron.* A permanent injunction shall enter against it, for the reasons set forth in this Court's earlier opinion.[13]

■ Section 3.1(B)(1)(b) requires the doctor performing the abortion to describe, on a form provided by the State, the "basis" of his best clinical judgment that the abortion is necessary. Although this Court sees no constitutional difficulty in requiring a physician to "certify" that the abortion was medically necessary,[14] to insist that a doctor "describe" the "basis" for that clinical judgment may unnecessarily interfere with both the confidentiality of the woman's abortion decision and the physician-patient consultation. The *Akron* Court made clear that neither of these two areas may be interfered with by the State during the first trimester, even by "minor regulations on the abortion procedure." [15] Further, it is unclear what need the State has for more detailed information than a certification. Accordingly, a permanent injunction shall issue as to Section 3.1(B)(1)(b).[16]

Section 3.2 was written to ensure that a woman gives voluntary and informed consent before an abortion is performed. Numerous subparts of this section have been preliminarily enjoined, and a permanent injunction shall issue against them for the reasons set forth in the earlier opinions.[17]

The only portion of Section 3.2 about which there continues to be a dispute is the first sentence of Section 3.2(A) which provides, simply: "No abortion shall be performed except with the voluntary and informed consent of the woman upon whom the abortion is to be performed." Plaintiffs' primary argument is not directed towards the substance of this sentence, but rather, to any piecemeal treatment of the section.

■ Form must not be elevated over substance by any court, especially when constitutional issues are raised. However, a case such as this also involves a statute, drafted with parts and subparts, and containing a severability clause. In such a situation, when constitutional infirmities are discovered, the court must struggle to effectuate the constitutional purpose of the legislature, to decide which clauses, subparts and sections must be enjoined, and to determine which of the remaining provisions may still be enforced.

The Supreme Court's decision in *Akron* teaches that effectuation of the legislature's constitutional purpose may be accomplished in several ways. First, the court may strike an entire undivided provision, on the grounds that severing only certain words or phrases would leave a remnant which the court could not be sure would have been enacted alone.[18] Alternatively, when a section has been carefully divided by the legislators into subsections, the court may find itself able to strike the unconstitutional subparts while leaving others, pursuant to a severability clause.[19] Finally, when an introductory clause is fol-

---

**12.** 627 F.2d at 786–87.

**13.** 579 F.Supp. at 383.

**14.** This was the rationale relied upon by this Court in initially upholding Section 3.1(B)(1)(b).

**15.** —— U.S. at ——, 103 S.Ct. at 2493.

**16.** Because Sections 3.1(B)(1)(a) and (B)(1)(b) have been enjoined, (B)(2) and (B)(3) are rendered meaningless. The permanent injunction

shall therefore issue against Section 3.1(B) in its entirety.

**17.** 627 F.2d at 779–86; 579 F.Supp. at 381. Defendants now concede that all of Section 3.2 is unconstitutional, with the exception of the first sentence of Section 3.2(A), discussed *infra.* Sections 3.2(B) and (C) shall therefore also be enjoined.

**18.** *See* —— U.S. at ——, 103 S.Ct. at 2504 n. 45.

**19.** The informed consent section at issue in *Akron* had several subparts. Part (A) simply stated

lowed by subparts, each of which are individually affected by the introduction, and the former is found to be unconstitutional, then each of the underlying subparts must also be enjoined because they are necessarily infected by the introduction's infirmities. This is true even if the subparts, standing alone, would be sound.[20]

■ In its earlier opinion, this Court followed the third approach outlined above to enjoin subsections 3.2(A)(1)(a)(i)–(iv). The overarching language in Section 3.2(A)(1)(a) was unconstitutional, so a preliminary injunction was issued against the subparts which followed it. In contrast, the disputed phrase in Section 3.2(A) does not follow any unconstitutional language; it is the first sentence of the section. It also sets forth a constitutional, and unquestionably wise requirement that informed consent be obtained.[21] Although the legislature clearly wanted "informed consent" to be defined as it had set forth in (a)(i)–(iv), I cannot believe that it would have retreated entirely from its desire to demand such consent once faced with this Court's ruling as to that definition. Accordingly, I find that the first sentence of Section 3.2(A) should not be enjoined.

> that informed consent was required, as § 3.2(A) does in the instant case. Part (B) of the *Akron* statute specified those things which a physician was required to tell a patient to ensure that her consent was "informed" and therefore is substantially comparable to § 3.2(A)(1) of the Illinois law. Although Part (A) was not stricken by the Court, Part (B) was. *See* —— U.S. at ——, 103 S.Ct. at 2489 n. 5.

**20.** *See* —— U.S. at ——, 103 S.Ct. at 2501 n. 37.

**21.** *See* 579 F.Supp. 380–381, citing the Seventh Circuit's opinion in this case and *Akron*.

**22.** Memorandum Opinion, November 16, 1979, pp. 19–21.

**23.** The affidavits submitted by defendants do not alter my conclusion. Although this evidence is apparently submitted in an effort to establish that an abortion can create a greater than *de minimus* risk of harm to a woman's future procreative potential, this conclusion was specifically rejected by the District Court after extensive testimony in *Scheinberg v. Smith*, 550 F.Supp. 1112 (S.D.Fla.1982). Moreover, even if

Section 3.3 is the mandatory parental notice section. Judge Flaum enjoined the entire section and defendants now concede its unconstitutionality. A permanent injunction must issue against it.

Section 3.4 requires spousal notification. I agree with Judge Flaum that the section is overinclusive and therefore unconstitutional.[22] It must be permanently enjoined.[23]

Sections 3.5 and 4, regarding information to be distributed to the woman, and the required use of hospitals for abortions after the first trimester, are both conceded by defendants to be unconstitutional.[24] Both shall be permanently enjoined.

Section 5 concerns post-viability abortions. Judge Flaum issued a preliminary injunction against the entire section based upon his finding that the definition of "viability" was unconstitutional. The recent amendment to the definition removes that earlier objection and renders Section 5(2) clearly constitutional.[25] The preliminary injunction against this subpart is therefore dissolved. Section 5(3) is rendered meaningless because it references another provision which will be enjoined. See discussion of Section 10, infra.

> defendants' factual assertions were accepted, their argument still fails to explain why either an estranged husband or one who has deserted his wife retains any constitutionally protected interest in being informed of the woman's intention to have an abortion. In *Scheinberg v. Smith*, 659 F.2d 476 (5th Cir.1981), the only case cited by defendants, the Court specifically relied upon the fact that the statute there did *not* require spousal notice if the couple was estranged. 659 F.2d at 486 ("given non-estrangement of the couple, as section 390.00(4)(6) posits..."). Thus, as Judge Flaum concluded, the section is unconstitutionally overbroad.

**24.** *See* 579 F.Supp. at 382 (§ 3.5(1)); 627 F.2d at 784 (§ 3.5(2)); *Akron*, —— U.S. at ——, 103 S.Ct. at 2493–2497 (hospitalization requirement). Section 4 is thus unconstitutional despite the amended definition of viability.

**25.** Plaintiffs concede this. See their "Memorandum in Support of Motion for Preliminary Injunction," November 9, 1979, p. 23.

Plaintiffs still insist, however, that Section 5(1) remains unconstitutional. They contend that this section, when read in conjunction with the definition of "viability" found in Section 2(2), creates an unconstitutional ambiguity of the type stricken in *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).[26] In that case the Supreme Court found it unclear whether the statute in question "import[ed] a purely subjective standard, or whether it impose[d] a mixed subjective and objective standard." 439 U.S. at 391, 99 S.Ct. at 683.[27] Such an ambiguity was constitutionally impermissible, said the Court, especially in light of the criminal sanctions imposed for a violation of the section.

■ Section 5(1) of the instant statute provides that "No abortion not necessary to preserve the life or health of the mother shall be performed unless the attending physician first certifies with *reasonable medical certainty* that the fetus is not viable on a form prescribed by the [Health] Department ..." (emphasis supplied). Viability, in turn, is now defined under Section 2(2) as "that stage of fetal development when, in the medical judgment of the attending physician based on the particular facts of the case before him there is a reasonable likelihood of sustained survival of the fetus outside the womb, with or without artificial support." Plaintiffs believe that because Section 2(2) "already purportedly has the equivalent of the 'reasonable medical certainty'" language in Section 5(1), the latter can only be read

as requiring, in essence that, prior to performing a non-therapeutic abortion, the physician must certify that with reasonable medical certainty (objective) there is in turn a reasonable likelihood that the fetus is not capable of [sustained][28] survival (*arguendo,* subjective). "Plaintiffs' Joint Reply Memorandum in Support of Motion for Preliminary Injunction," November 9, 1979, p. 23.

I disagree with plaintiffs' reading of Section 2(2). I do not believe that it establishes an *"arguendo* subjective" standard. It enunciates an objective standard. The fact that a physician must determine whether a fetus is viable on a case by case basis, rather than by simply referring to an automatic gestational time limit such as 28 weeks, does not render the standard which he is to apply "subjective." Instead, it is a recognition of the medical fact that the point of viability varies with each pregnancy and is a medical question. *See Danforth,* 428 U.S. at 64–65, 96 S.Ct. at 2838–2839. Likewise, the fact that a physician is to rely upon his "medical" judgment does not imply that he eschews the standards of objective reasonableness established by the medical community, and looks solely to his own past experience. To the contrary, it implies exactly the opposite. This is especially true when the clause is viewed in context: "in the *medical judgment of the attending physician* based on the particular facts of the case before him, there is a *reasonable likelihood* of sustained survival ..." (emphasis supplied). An objective reasonableness standard is patently intend-

**26.** In *Colautti* the statute provided, in pertinent part:

Every person who performs or induces an abortion shall prior thereto have made a determination based on his experience, judgment or professional competence that the fetus is not viable, and if the determination is that the fetus is viable or if there is sufficient reason to believe that the fetus may be viable, shall exercise that degree of professional skill...

*Id.* at 380 n. 1, 99 S.Ct. at 678 n. 1.

**27.** As the Court explained:

Apparently, the determination of whether the fetus "is viable" is to be based on the attending physician's "experience, judgment or pro-

fessional competence," a subjective point of reference. But it is unclear whether the same phrase applies to the second triggering condition, that is, to "sufficient reason to believe that the fetus may be viable." In other words, it is ambiguous whether there must be "sufficient reason" from the perspective of the judgment, skill, and training of the attending physician, or "sufficient reason" from the perspective of a cross section of the medical community or a panel of experts.

*Id.* at 391, 99 S.Ct. at 683–684.

**28.** The change in the quotation reflects the recent amendment to the law redefining viability. See note 9, *supra.* It does not alter plaintiffs' argument.

ed to control. Because I do not read Section 2(2) as establishing a standard which conflicts with the "reasonable medical certainty" language of Section 5(1), the latter is not unconstitutionally ambiguous and shall not be enjoined.[29]

Section 6 contains various provisions regarding a physician's standard of care for the fetus and experimentation with the fetus. Section 6(2) has already been preliminarily enjoined by the Seventh Circuit on the grounds that the phrase "aborted alive" is unconstitutionally vague in the context of a criminal provision.[30] This Court relied upon similar reasoning to enjoin Section 6(3) which refers to use of a fetus or "premature infant aborted alive."[31] The arguments raised presently by defendants were rejected earlier by the Court of Appeals, and a permanent injunction must issue against both subsections.

The Seventh Circuit likewise struck down Section 6(6).[32] Regardless of the stage of the woman's pregnancy, the section required physicians to inform the woman of the possibility of "organic pain" to the fetus, when there was a "reasonable medical certainty" that the particular method of abortion to be used would cause such pain. It further provided that in such situations, the doctor must tell the woman of available methods of alleviating or abolishing the fetal pain. Criminal penalties would be imposed if a physician violated the section.

The Appeals Court recognized that this requirement was a "direct burden on the abortion decision." 627 F.2d at 784. The Court found no countervailing evidence to support any purported State interest in imposing such a burden, noting that "[t]he uncontroverted medical testimony in the record at this stage describes this information as 'medically meaningless, confusing, medically unjustified, and contraindicated, causing cruel and harmful stress to ... patients.'" Id.

Defendants have now submitted affidavits which they apparently hope will remove the constitutional problems found by the Court of Appeals. Their hope is unfounded. Without question, defendants' submission of evidence on this topic does not alter the legal conclusion that the dissemination of such information directly burdens a woman's decision whether to have an abortion. As to the State's interest in disseminating the information, the new evidence at most suggests that there is a difference of opinion among the medical community regarding fetal pain. It does not affirmatively prove that distribution of the required information would be medically justified. It also therefore does not refute the finding that this section intrudes on the discretion of the pregnant woman's physician.

These conclusions are consistent with that reached by the Supreme Court in *Akron*. There the Court struck down a regulation requiring a doctor to describe "in detail the anatomical and physiological characteristics of the particular unborn

---

**29.** Plaintiffs also argue that if the definition of viability in Section 2(2) already incorporates an "objective" medical certainty standard, then Section 5(1), because it employs the term "viable," should only need to provide that the physician "must certify" the fetus not viable. The language requiring certification of viability "with reasonable medical certainty" is rendered superfluous, say plaintiffs, by this Court's interpretation of Section 2(2).

I do not agree. it is true that a Court should be loathe to find statutory language redundant or superfluous. *See Colautti,* 439 U.S. at 392, 99 S.Ct. at 684. However, the Court also must endeavor to interpret statutes in such a way as to find them constitutional, if that is possible. *See, e.g., Atwell v. Merit Systems Protection Bd.,* 670 F.2d 272, 286 (D.C.Cir.1981). In this case, the two arguably redundant clauses were not found directly in the same sentence as they were in *Colautti;* no redundancy was immediately obvious to a reader of Section 5(1), and would become evident only after referring back to the definition found in Section 2(2). More importantly, my interpretation of the relevant language seems most consistent with the plain language of the statute, in contrast to the tortured reading pressed upon the Court in *Colautti* by appellants.

**30.** 627 F.2d at 790–91.

**31.** 579 F.Supp. at 383.

**32.** 627 F.2d at 784.

child at the gestational point of development at which the abortion is to be performed, *including,* but not limited to, appearance, mobility, *tactile sensitivity, including pain, perception or response,* brain and heart function, the presence of internal organs and the presence of external members" (emphasis supplied).[33] The Supreme Court ruled that "much of [that] detailed description ... would involve at best speculation by the physicians."[34] The Court further specifically referenced the District Court's finding that "there was much evidence that it is impossible to determine many of [these] items, ... such as the 'unborn child's' sensitivity to pain."[35] It is thus clear that Section 6(6) is unconstitutional and must be permanently enjoined.

Section 6(7) involves *in vitro* fertilization. This Court issued a preliminary injunction against it based upon its use of the phrase "human being," a term enjoined as unconstitutional.[36] Defendants correctly point out that plaintiffs have no standing to challenge this section.[37] Thus, although this Court continues to adhere to its view of Section 6(7) on the merits, the matter cannot properly be considered and no injunctive relief can be obtained.

The final three subparts of Section 6 set forth the standard of care which a doctor must follow in particular situations. Sections 6(1) and 6(4) were preliminarily enjoined by Judge Flaum because they contained the term "viable," and the statutory definition of viability had been deemed unconstitutionally vague.

■ Section 6(4), as amended by H.B. 666, now provides in relevant part:

No person who intentionally terminates a pregnancy shall intentionally fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted when there exists, in the medical judgment of the physician performing the pregnancy termination based on the particular facts of the case before him, *a possibility known to him of sustained survival* of the fetus apart from the body of the mother, with or without artificial support.

Thus, the section no longer regulates cases where the fetus might be capable of "more than momentary survival" outside the womb; the "sustained survival" language is utilized instead.

According to plaintiffs, however, this change is insufficient to cure the provision's infirmities. Section 6(4) continues to regulate pre-viability abortions, according to plaintiffs, because it governs circumstances where there is even "a possibility" of sustained survival. To be constitutional, only post-viability abortions can be regulated, and those cases occur only when the attending physician determines "In [his] medical judgment ... based on the particular facts of the case before him, there is a *reasonable likelihood* of sustained survival of the fetus outside the womb, with or without artificial support." *See* § 2(2) (definition of viability) (emphasis supplied). Thus, as plaintiffs read Section 6(4), the State has carved out a space of time prior to viability in which it attempts to dictate how a physician must perform an abortion. Criminal sanctions arise for a failure to follow these dictates, thereby impermissibly imposing a direct obstacle on the abortion decision. *See Colautti v. Franklin,* 439 U.S. 379, 386 n. 7, 96 S.Ct. 675, 681 n. 7.

Defendants respond that the section "does not purport to regulate pre-viability abortions." Rather, they argue, Section 6 (4) "simply acknowledges that the physician cannot easily determine whether or not the fetus is viable—that the physician might mistake the fetus who can maintain

**33.** —— U.S. at ——, 103 S.Ct. at 2489 n. 5.

**34.** —— U.S. at ——, 103 S.Ct. at 2500.

**35.** —— U.S. at ——, 103 S.Ct. at 2500 n. 34.

**36.** 579 F.Supp. at 380 n. 5.

**37.** Memorandum Opinion, November 16, 1979, pp. 6–7.

life separate from the mother from a fetus who cannot, yet employ methods to terminate pregnancy that would make survival of a fetus who is actually viable impossible or improbable. Section 6(4) merely maximizes the opportunity for survival of a fetus who is in fact viable, but who cannot be diagnosed as viable with certainty while in the womb." Defendants' Memorandum, October 31, 1983, p. 3.

Defendants' argument disproves itself. Clearly defendants agree that two distinct circumstances are being regulated by the State. Under Section 6(1), a physician must exercise a certain degree of care when he knows that the fetus is viable. The Act itself states that that stage of "viability" is reached when there is a "reasonable likelihood" of the fetus' sustained survival.

In contrast, under Section 6(4) the State wishes to cover another stage, in addition to that described in Section 6(1): a stage at which the doctor has less certainty that the fetus can survive. That stage clearly encompasses, by defendants' own admission, both those circumstances when the doctor believes that the fetus is reasonably likely to be capable of sustained survival *and* those in which he reasonably believes it may not be so capable.

It is hard for me to understand how defendants can offer the foregoing description of Section 6(4) and simultaneously maintain that it does not attempt to regulate pre-viability abortions. Apparently defendants want the Court to distinguish between the point of viability after which abortions can be regulated and the point at which a physician, in his medical judgment concludes that a fetus is viable. Defendants wish to view viability as an absolute concept, a point in time after which the State can regulate abortions, whether or not a doctor has recognized the reasonable likelihood that this critical point has been reached.

Defendants cannot constitutionally prevail in their view. As was discussed previously, the courts and the Illinois legislature have both recognized that the point of viability cannot be defined in any absolute sense, devoid of any input by a physician. The opposite is true. Viability is a medical question, to be determined by a physician in each individual case based on the doctor's assessment of the fetus' "reasonable likelihood" of "sustained survival." Section 6(4) does attempt to regulate pre-viability abortions, by imposing criminal sanctions on a physician for conduct engaged in during that stage. It is therefore clearly unconstitutional, *Colautti v. Franklin*, 439 U.S. at 386 n. 7, 96 S.Ct. at 681 n. 7, and must be permanently enjoined.[38]

Section 6(1), in contrast, no longer contains constitutional infirmities and now may stand. The major objection raised by plaintiffs to this section is again premised upon the *Colautti* subjective/objective ambiguity discussed *supra*. Plaintiffs assert that a physician is charged with applying the same standard of care at two different stages of gestational development: when a fetus is known to be viable, under Section 6(1), and when there is a mere "possibility ... of more than momentary survival," under Section 6(4).

Plaintiffs' argument loses all persuasive power once Section 6(4) has been declared unconstitutional, as it has been here: a physician can no longer be confused by any inconsistencies between the two sections, because Section 6(4) will be stricken. More fundamentally, it is hard to understand why doctors would have been confused in any event. Unlike the situation in *Colautti*, where it was unclear which of two different standards would be operative in two different situations, here the two sections "impose *precisely* the same standard of care on the physician for obviously *differ-*

---

**38.** Despite defendants' arguments, *Wynn* is not to the contrary. The entire discussion referenced by defendants in that case involved the regulation of post-viability abortions only. The statute at issue there contained a constitutional definition of viability and no other statutory language attempted to regulate pre-viability abortions. 449 F.Supp. at 1320, 1321 n. 5.

ent stages of fetal development."[39] Rather than causing confusion, the legislation arguably alleviates it. Regardless of which of the two stages of development had been reached by the fetus, the doctor would simply apply the one required standard of care. Finally, it must be noted that this section has already withstood the scrutiny of this Court and the Court of Appeals. For the reasons articulated here and in the earlier rulings,[40] Section 6(1) is constitutional. The preliminary injunction entered against it shall be dissolved.[41]

The Seventh Circuit has held that plaintiffs do not have standing to challenge either Section 7 or Section 8.[42] This Court therefore may not enter injunctive relief as to those sections.

Section 9 prohibits the use of saline amniocentesis after the end of the first trimester. Judge Flaum entered a preliminary injunction against this section[43] which defendants concede should be made permanent.

■ Section 10 involves various reporting requirements required by the State. Judge Flaum refused to enter a preliminary injunction against the section as a whole,[44] relying in part on the fact that a more limited version of the statute had been upheld earlier in *Wynn v. Scott*, 449 F.Supp. at 1326–1327, *aff'd sub nom. Wynn v. Carey*, 599 F.2d at 194. Certain other subparts of Section 10 were enjoined by Judge Flaum, the Court of Appeals, and this Court because they referenced or incorporated other unconstitutional sections of the statute.[45]

Since the entry of Judge Flaum's order, amendments to Section 10 have been enacted. After considering the effect of these changes on the section and the numerous subsections which have already been stricken, I find that the entire section should be permanently enjoined and redrafted by the legislature.

The constitutional standards for assessing recordkeeping provisions are clear. In *Danforth, Akron,* and *Ashcroft*[46] the Supreme Court has stated, as a threshold matter, that "[r]ecordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health" are constitutionally permissible. *Danforth*, 428 U.S. at 80, 96 S.Ct. at 2846. However, as the *Akron* decision held, the "decisive factor" in allowing such regulation is whether "the State [meets] its burden of demonstrating that [the] regulations furthered important *health-related State concerns.*" —— U.S. ——, 103 S.Ct. at 2481 (emphasis supplied).

Moreover, even if the State shows that the required records serve important maternal health-related State concerns, it must also prove that the records neither infringe upon the "patient's confidentiality and privacy" nor impose a needless "extra layer and burden of regulation" upon her doctor. *Danforth*, 428 U.S. at 80, 96 S.Ct. at 2846. If either of these tenets were violated, the statute would impermissibly infringe upon the woman's right to choose to have an abortion.

---

**39.** This is plaintiffs' characterization of the two sections. "Plaintiffs' Joint Reply Memorandum in Support of Motion for Preliminary Injunction," November 9, 1979, p. 25.

**40.** *Wynn v. Scott*, 449 F.Supp. at 1320–22, *aff'd sub nom. Wynn v. Carey*, 599 F.2d at 194.

**41.** Plaintiffs maintain that Section 6(5) would be rendered meaningless if both Sections 6(1) and 6(4) were enjoined. However, because Section 6(1) has not been enjoined, no permanent injunction shall issue as to 6(5).

**42.** 627 F.2d at 791.

**43.** Memorandum Opinion, November 16, 1979, pp. 26–27.

**44.** Memorandum Opinion, November 16, 1979, pp. 27–29.

**45.** Memorandum Opinion, November 16, 1979, p. 29 n. 20 (§§ 10(i), (j), (*l*) [in part] ); 627 F.2d at 784–86, 792 n. 36 (§§ 10(k), (*o*) [in part]); 579 F.Supp. at 383 (§ 10(n) incorporated § 3.1 (b), enjoined by this Court). The amendment to the definition of "viability" affects only § 10(i).

**46.** *Planned Parenthood, Kansas City, Mo. v. Ashcroft*, —— U.S. ——, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983).

The Supreme Court applied the foregoing principles to the recordkeeping statute at issue in *Danforth,* and concluded that although the provisions there were "perhaps approaching impermissible limits," they were "not constitutionally offensive in themselves." *Id.* at 81, 96 S.Ct. at 2846. The Court cautioned that it assumed that the Missouri Division of Health would not interpret and implement the provisions in any way which would "accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction." *Id.* It also stated that it had specifically relied upon "[t]he added requirements for confidentiality, *with the sole exception for public health officers,* and for retention for seven years, a period not unreasonable in length," to "assist and persuade us in our determination of the constitutional limits." *Id.* (emphasis supplied). The Court re-emphasized the importance of these factors in *Ashcroft* this year. *Ashcroft,* —— U.S. at ——, 103 S.Ct. at 2524 n. 14, quoting *Danforth,* 428 U.S. at 81, 96 S.Ct. at 2847–2847.

The *Wynn* Court also upheld a recordkeeping statute, the predecessor statute to the one at issue today. The Court reasoned that the seven items required by the Act were not unconstitutionally burdensome because the information could be assembled quickly and recorded on forms. The information sought would be "useful in learning about the impact of abortion on maternal health," an appropriate State goal. And, as in *Danforth,* the *Wynn* Court assumed that the Illinois Department of Health would not interpret the section so as to require a burdensome amount of detail. *Wynn v. Scott,* 449 F.Supp. at 1327.

The *Wynn* Court did find one element of the section unconstitutional: that which provided that the abortion report would be kept confidential, "except as otherwise provided by law," and which incorporated the requirement of a fetal death report for each abortion performed after 20 weeks of gestation. This portion of the statute violated a woman's right to confidentiality, said the Court. It required reporting the woman's name, and "[m]ost damaging," it would be "available upon request to a number of persons other than state officials compiling statistics." Such a possibility of disclosure "is far from innocuous"; it could indirectly interfere with what should be a "woman's independence in deciding whether to have the abortion." *Id.* at 1327–1328. These provisions were therefore unconstitutional.

A comparison of the recordkeeping provisions at issue in *Danforth, Wynn* and this case immediately makes clear that Section 10 of the present Act demands much more information from a physician and affords much less protection to a woman's privacy interests than either of the constitutional statutes. For example, the amended version of Section 10 no longer requires simply the seven pieces of straight-forward factual data required by the legislation upheld in *Wynn.* Section 10 now requires a physician to fill out two separate forms and demands, on each, fifteen specified pieces of information, including "medical indications" and the "basis" for certain judgments and actions.

The range of persons who will have access to these records, and the use to which the collected information may be put is also far broader than that permitted under the carefully drawn confidentiality provisions upheld in *Danforth.* In contrast to the narrowly circumscribed provision at issue there, allowing only public health officers to see the records, the instant statute as now amended would allow distribution of the "redacted" copy[47] to the public at large. While the patient's name would not be specified in these redacted copies, for a citizen residing in a small Illinois town, publication of information including her residence, date of birth, race and marital status could effectively identify her to her entire community. Clearly, such a result

---

**47.** The "Redacted Copy" shall be identical in all particulars to the "Original Report" except that the patient identification number, attending physician's name, and facility where the abortion was performed shall be omitted.

has never been and can never be tolerated by the Court because of its patent affect on a woman's protected decision whether to have an abortion. *See Wynn v. Scott*, 449 F.Supp. at 1328.

The Act also now allows distribution of all of the information in the original copy "to another state agency required or authorized to conduct investigations of *professional or business practices* in hospital, ambulatory surgical treatment center, or *other facility*" (sic) (emphasis supplied). Although investigatory State agencies "shall not disclose individual patient information publicly," and "[a]ll reports received by the Department shall be kept confidential and shall be used only for statistical purposes," the statutory language further provides a broad exception to the foregoing: "except to the extent necessary to secure the rights or interests of a person or the State pursuant to a court order in civil or criminal actions or proceedings to grant or revoke licenses." Not only has the legislature gone far beyond the narrow "public health officials" language which the *Danforth* Court acknowledged to be "approaching impermissible limits." By its broad references to "professional or business practices" of any "facility" and licensure proceedings, the legislature has exceeded any needs reasonably related to the State's interest in preserving maternal health. The effective—and perhaps intended—result of the broadly phrased distribution provisions is to infringe on a woman's abortion decision. This infirmity, when coupled with the more onerous administrative burden placed on physicians by this statute, makes clear that Section 10 is unconstitutional.

Finally, I see no purpose in trying to retain certain disjointed lines or subparts of Section 10. Given the numbers of parts

which have already been preliminarily enjoined, the additional concerns expressed herein regarding the recently amended portions of the section, and the way in which the legislators structured their drafting of the section, I conclude that an injunction against the entire section should be entered.

■ Section 11 sets forth penalties for certain types of unprofessional conduct. Plaintiffs have not challenged subsection (a). Section 11(b) is rendered meaningless because it references other provisions which have been permanently enjoined. As to Section 11(c), I concur with plaintiffs' view that it is drafted too broadly. It could be read as prohibiting a doctor from receiving a fee from a *patient* for services rendered, and then referring her to another doctor or clinic for an abortion. What the subsection was apparently intended to do is prohibit a doctor from receiving a referral fee from another *doctor* or *clinic*. This legitimate purpose is accomplished by the more carefully worded amendment to the Act, Section 11.1. Accordingly, Section 11 (c) will be permanently enjoined.

Section 11(d) was enjoined by the Seventh Circuit. That Court concluded that by its "use of the term 'abortifacient' in describing certain birth control methods [Section 11(d)] forces the physician to act as the mouthpiece for the State's theory of life." [48] Although defendants now contest this reasoning, I have neither the inclination nor the authority to dispute the Appeals Court on this matter, and therefore enter a permanent injunction as to Section 11(d). [49]

Section 11(e) was previously enjoined by this Court on the grounds that the patient's name should not be disclosed. [50] I continue to see no legitimate compelling state inter-

---

**48.** 627 F.2d at 789.

**49.** Defendants have submitted affidavits from women who state that they would want to be told whether the birth control method prescribed for them was an abortifacient. While this evidence does speak to the affiants' preferences, it does not refute the evidence supplied by plaintiffs and referenced by the Seventh Circuit that "this requirement is confusing and needlessly painful" at least as to certain other patients besides defendants' affiants. More fundamentally, the Seventh Circuit enjoined Section 11(d) because it impermissibly forced the doctor to espouse the State's theory of life. Defendants' new evidence does not affect that rationale at all.

**50.** 579 F.Supp. at 384.

est which is furthered by this requirement and therefore see no justification for sanctioning it, regardless of the criminal penalties which would attach to any improper use of that information. Section 11(e) is therefore permanently enjoined. I likewise see no reason to alter my previous conclusion regarding Section 11(f)[51] and therefore also enter the permanent injunction against it.

The final section of the Act challenged by plaintiffs is Section 12, regarding pathological testing of the fetus. Although this provision is no longer rendered infirm by its incorporation of the term "viability,"[52] the section continues to be unconstitutional because it employs the phrase "live birth." For the reasons expressed in this Court's earlier opinion,[53] a permanent injunction shall issue against Section 12.

Section 14(2), like Sections 5(3) and 11(b) has been rendered meaningless and will be permanently enjoined.

The only remaining issue for resolution is whether the entire Act should be enjoined, as plaintiffs request. Without question, the permanent injunction entered today significantly affects major portions of the Illinois Abortion Act of 1975, as amended. I also agree with plaintiffs that the *Akron* Court indicated that a "clause-by-clause" parsing of a statute into disjointed pieces was inappropriate in certain circumstances.[54] However, I further note that the Supreme Court did not invalidate the entire statute in *Akron* even though major sections of that law were held to be unconstitutional. To do so either there or in this case would be to completely ignore the legislators' intention as expressed in the severance clauses of the statutes.[55] I therefore decline to enter the permanent injunction against the entire Act.

A permanent injunction shall issue against the following sections: 2(8), 2(9), 2(10), 3.1(B), 3.2(A)(1), 3.2(B), 3.2(C), 3.3, 3.4, 3.5, 4, 5(3), 6(2), 6(3), 6(4), 6(6), 9, 10, 11 (b), 11(c), 11(d), 11(e), 11(f), 12, 14(2).

It is so ordered.

---

**51.** 579 F.Supp. at 384.

**52.** *See* note 9, *supra*.

**53.** 579 F.Supp. at 383–384.

**54.** *See* discussion *supra*.

**55.** Plaintiffs also argue that the Preamble evidences the legislators' unlawful purpose in enacting the statute, and therefore shows that the entire Act must be enjoined. In particular, plaintiffs point to the State interests espoused and object to these as being beyond the scope of interests which the Supreme Court has said states may legitimately protect in abortion legislation.

I did not find the Preamble unconstitutional and will not premise a injunction of the entire law on that theory. An evaluation of a statute's constitutionality does not end with a review of the "interests" recited in a preamble by legislators. What is critical in assessing constitutionality is not the list of areas in which the State proclaims itself to have a legitimate interest in protecting, but what interests the courts and Constitution will recognize as legitimate and compelling in the circumstances.